CEDAR RAPIDS BLOCK COMPANY,
Inc., and Cedar Sand and Gravel
Company, Petitioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHAUFFEURS, TEAMSTERS AND
HELPERS, LOCAL UNION
NO. 238, Respondent.

Nos. 17430, 17472.

United States Court of Appeals
Eighth Circuit.

June 18, 1964.

Robert E. Conley, of Connolly, O'Malley & Conley, Des Moines, Iowa, made argument for Chauffeurs, Teamsters and Helpers, Local Union 238, and filed brief for respondent in No. 17472.

D. G. Ribble, Cedar Rapids, Iowa, made argument for Cedar Rapids Block Company, et al., petitioner in No. 17430, and filed brief with C. J. Lynch, Cedar Rapids.

Richard P. Lawlor, Atty., N.L.R.B., Washington, D. C., made argument for N.L.R.B. and filed brief with Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, N.L.R.B., Marcel Mallet-Prevost, Asst. Gen. Counsel, N.L.R.B. and Lee M. Modjeska, Atty., N.L.R.B., Washington, D. C.

Before VAN OOSTERHOUT, RIDGE and MEHAFFY, Circuit Judges.

VAN OOSTERHOUT, Circuit Judge.

These two cases, which were consolidated below, are before this court on the petition of the Cedar Rapids Block Company, Inc. (Block) and Cedar Sand and Gravel Company (Sand) to review and set aside the order of the National Labor Relations Board, and the cross-petition of the Board for enforcement; and on the petition for enforcement of the order against the Chauffeurs, Teamsters and Helpers, Local Union No. 238 (Teamsters) and the cross-petition to review.[1] Jurisdiction in this circuit is based upon the alleged occurrence of unfair labor practices in Cedar Rapids, Iowa.

The amended charge filed by the International Union of Operating Engineers, Local 234, of which the alleged discriminatee Clarence C. Johnson was a member, was against Block and Sand and was based upon the unlawful discharge of Johnson "because of his refusal to join or assist" Teamsters in violation of § 8(a) (1) and (3) of the National Labor Relations Act. 29 U.S.C.A. § 158(a) (1) and (3). Johnson filed an amended charge against Teamsters based upon its causing Block and Sand to discriminate against him "because of his lack of membership in the said labor organization" and thus violating § 8(b) (1) (A) and (b) (2) of the Act. 29 U.S.C.A. § 158 (b) (1) (A) and (b) (2).

Block manufactures and sells concrete building products and masonry wall reinforcing materials. Block has had a collective bargaining agreement with Teamsters for over a decade which covers employees at its J Street plant. In 1956 Block's sole local source of sand and gravel was shut down by a prolonged strike. After finding the cost of importing sand from an out-of-town supplier too prohibitive, Harold Spaight, the president of Block, decided to erect and operate a sand plant in an effort to insure against future difficulties in obtaining sand and against possible increases in price by the then existing monopoly. Spaight negotiated with Johnson and Ray Fox, and on October 29, 1956, they entered into an agreement with Sand under which Johnson and Fox agreed to be responsible for production, hiring, and maintenance of machinery. The sand plant was incorporated in May 1957 with Spaight owning all the stock; however, he sold the stock to Block in the spring of 1959, and Sand thereafter was operated as a wholly owned subsidiary. The sand plant started producing in the spring of 1957 and approximately 90 percent of its production was sold to Block. In 1958 Sand entered into a con-

---

1. The decision of the Board is reported in 143 NLRB No. 106.

ventional labor agreement with Operating Engineers which agreement specifically approved of the prior agreement between Fox and Johnson and Sand.

In November of 1958 the sand plant was closed down for the winter and Block continued to purchase sand from the accumulated stockpile. Johnson was brought up to Block's J Street plant on a temporary basis until the next spring operations at the sand plant resumed. While at J Street, Johnson operated a portable boom crawler crane. By spring, Block decided it could buy sand more economically from its former supplier who was back in operation after the strike. However, the machinery and equipment were maintained as a type of insurance against a price increase or another strike and Johnson was retained on the payroll of the Sand Company so that he would be available to operate the now idle sand plant. Beginning in January 1959, and continuing until April 6, 1962, when he was notified of his discharge, Johnson spent less than 10 percent of his time at the sand plant where his primary task was the maintenance of the machinery for possible future use. Although the rest of the time was spent operating the crawler crane which was Block work, he was paid by Sand. Sand was reimbursed by Block for this work.

The presence of Johnson in the J Street plant where all the rest of the employees were covered by the Teamster's contract provides the setting for the heart of this controversy. The contract provided for a separate seniority system at the J Street plant; job vacancies were to be posted and were to be filled by bidding on the seniority basis. Seniority for bidding purposes dated from employment in that particular plant and not from employment by the company in other divisions or locations. Johnson's name was never included in the seniority lists posted. Although members of the Teamster unit were laid off from time to time, Johnson was not. He did not punch a timeclock as did the other J Street employees, and he was paid a guaranteed weekly wage whereas the other employees received only an hourly wage. The business agent for the Teamsters from the start contended the work done at J Street by Johnson was within their unit which would require Johnson to be represented by Teamsters for collective bargaining purposes. However, the manager of J Street plant and Johnson both continually asserted that Johnson was merely a Sand employee on temporary loan to J Street and the matter was allowed to ride as such for some time.

In the summer of 1961 Block acquired an overhead crane and Johnson helped in its installation in the J Street plant which was completed in the latter part of April 1962. It became apparent to all concerned that the overhead crane would be a permanent part of the J Street plant, and that it would do not only the work previously performed by Johnson with the crawler crane, but also work done by a lift truck which was operated by an employee who was a member of the unit. Teamster representatives again asserted its coverage by their contract and the manager of the J Street plant agreed. Johnson hoped to be assigned to the new crane although he knew that Teamsters were claiming the job as within their unit, and he knew that he had no seniority even if it be assumed that his seniority did in fact commence from January 1959, when he began spending a majority of his time at J Street, since Joe Shuff who eventually did get the job, had seniority from May 1958.

At approximately the same time that the overhead crane was nearing the completion of its installation, the question of what to do with the sand plant was also coming to a head. After an additional source of sand and gravel became available in the Cedar Rapids area due to the planned establishment of a plant by another businessman, the decision to sell the sand plant was made in the first week of April 1962. In a letter dated March 29, 1962, Johnson received notice of his discharge which read: "Due to the inactivity of our sand operation and causes beyond our control,

your employment with this company will terminate as of Friday, April 6." About one month prior to his discharge, the manager of J Street had a conversation with Johnson in which he suggested three alternatives which remained open to him: (1) accept employment by the Block Co. and let Block negotiate with Teamsters to give him a preferred place on the seniority list; (2) become a Block employee in the usual manner at the foot of the list; or (3) do nothing. Johnson refused to consider any position other than that of overhead crane operator.

The Trial Examiner considered the sole issue in both of these cases to be whether the discharge was occasioned by his lack of membership in Teamsters and found the reason for the discharge to be that the disposition of the sand plant meant that his retention as potential operator of that plant was no longer warranted. The Trial Examiner found that whatever pressure was being exerted by Teamsters was aimed at the inclusion of the overhead crane job in their unit— not at the joining of their union.

The Trial Examiner, for adequate reasons set out in his report, credited the testimony of the employer in instances where the evidence was in conflict.

The Examiner found that Johnson was an employee of Sand, not Block, and that he was terminated by Sand because his services were no longer needed by reason of the closing and disposition of the Sand plant.

The Examiner found no merit to the General Counsel's contention that Johnson was a part of the bargaining unit at the J Street plant and further found that even if he was so regarded, he would have had no right to the crane job as others in the unit had greater seniority. The Examiner, inter alia, also determined:

"I find nothing unlawful in the conduct of the employer in discharging him or in the conduct of the Teamsters in opposing his employment on the overhead crane.

\* \* \* \* \* \*

"I find, in short, that the Sand Company discharged Johnson, that the Block Company then declined to hire him for the crane job (the only kind of job he would have considered), and that neither of those actions was connected in any way with his union membership or lack thereof."

The Examiner recommended the dismissal of the complaints filed against the employer and the Teamsters.

Contrary to the Trial Examiner, the Board found that the decision to discharge Johnson was at the insistence of Teamsters and due to the substitution of the overhead crane for the crawler crane rather than the sale of the sand plant equipment, and that this discharge constituted discrimination which necessarily encouraged union membership in violation of the Act. The Board found that the discharge could not be defended on unit grounds since the literal language of the contract did not specifically include either the crawler or the overhead crane, and thus the inclusion of the overhead crane job would be an addition to the existing unit which the parties are not free to include because of the prior exclusion of the crawler crane. The Board concluded that "a defense of this kind would require irrefutable proof that the parties' unit determination, designed to coerce an employee to accept unwanted union representation, was made in good faith and correct." The Board based its finding on the conclusion that in Johnson's mind joining the unit was the same as joining the union.

The primary issue here presented is whether the Board's conclusions are supported by substantial evidence on the record as a whole within the teaching of Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456. The Examiner's findings, which are contrary to those of the Board majority, are

884

a part of the record to be considered. With respect to such inconsistent findings, Universal Camera states:

"We do not require that the examiner's findings be given more weight than in reason and in the light of judicial experience they deserve. The 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree. We intend only to recognize that evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony. The significance of his report, of course, depends largely on the importance of credibility in the particular case." 340 U.S. 474, 496, 71 S.Ct. 456, 469.

■■■ In National Labor Relations Board v. South Rambler Co., 8 Cir., 324 F.2d 447, 449–50, we stated principles applicable to our situation here, including the following:

"Certainly, an employer may hire and discharge at will, so long as his action is not based on opposition to union activities. * * * An inference that a discharge of an employee was motivated by his union activity must be based upon evidence, direct or circumstantial, not upon mere suspicion, * * * and the burden of proving an improper motive for discharge is upon the Board." (Citations omitted.)

To like effect, see Beaver Valley Canning Co. v. N. L. R. B., 8 Cir., 332 F.2d 429.

■■■ Here, in order to show the violations of the Act charged, the burden is upon the Board to show the discharge was for the unlawful purpose of discouraging or encouraging union activity. In searching for this motive, the Board on the surface stated its adoption of the Trial Examiner's credibility findings, but proceeded in fact to disagree with the credited testimony of Mr. Becker, Executive Vice President of Block and Vice President and Treasurer of Sand, that the sole reason for the discharge was the sale of the sand plant. The Board finds an unlawful motive here even though it was recognized that the Trial Examiner uniformly discredited all witnesses who testified that officials of the employer and Teamsters had stated that Johnson could not operate the overhead crane unless he joined Teamsters.

In reaching its conclusion, the Board finds fault with the failure of the Trial Examiner to find that there was in fact only one employer involved here, thus disregarding the separate entities of Sand and Block. Although there appears to be a lack of substantial evidence in the record indicating a justification for piercing the corporate identities to find Sand as the alter ego of Block, it appears unnecessary to discuss the evidence in detail. All the parties involved, including Johnson, considered Johnson to be an employee of Sand. As the Trial Examiner reasoned, even if Sand were considered a part of Block, the unit contract at J Street would not recognize the seniority accrued in other divisions of the company, and thus the crane job would not necessarily have gone to Johnson.

The Board erroneously stated that the record shows Johnson to be the only employee at the J Street plant qualified to operate the crawler crane and thus would have continued indefinitely at this job regardless of the disposition of the sand plant. This conclusion is in direct conflict with the evidence which shows that Mr. Shuff, who actually did assume the operation of the overhead crane, had previous experience operating various kinds of cranes and had substituted for Johnson on the crawler when Johnson was absent. Also, Mr. Mentzer, who had been working at J Street for several years prior to the discharge, replaced Shuff without having any difficulty whatsoever.

Contrary to the finding of the Trial Examiner based upon credited testimony of several witnesses, the Board found "No issue was raised as to Johnson's continued employment prior to the acquisition of the overhead crane." The record clearly shows that Johnson's presence at J Street was a source of constant concern both to the manager who complained about Johnson's guaranteed higher wages which were carried over from his agreement with Sand and to the J Street employees who were laid off from time to time while Johnson was not.

Apparently realizing the vulnerability of the position that there was substantial credited evidence showing the motive for discharge to be lack of union membership, the Board appears to circumvent what was believed to be the primary issue throughout the hearing by finding that the insistence by Teamsters that the crane was within their unit, when the Board in fact found as a matter of law that it was not, was in itself a violation of the Act since the result would necessarily encourage union membership. The Board concluded that in Johnson's mind joining the unit and joining the union were synonymous.

Both the employer and Teamsters argue that the Board's conclusion that the discharge could not be defended on unit grounds was prejudicial because such conclusion disregarded the distinction between being represented by a union as opposed to being a member thereof. The amended complaints and the General Counsel stated the position that the discharge was based upon lack of membership. It is reasonable to assume, as did the Trial Examiner, that the union representatives were aware of Iowa's "Right to Work" law which precludes insistence on union membership as a condition of employment. The credited testimony supports the conclusion that the objective sought was solely to protect the seniority

rights of the members of the unit. The possibility that Johnson misunderstood the distinction between unit and union membership, as contended by the Board, is not sufficient basis from which to infer an unlawful motive on the part of the charged parties.

The General Counsel asserted throughout the hearing that Johnson's work at all times at J Street was covered within the scope of the unit contract. Because of the Board's conclusion that the crane job was not within the unit, the General Counsel now changes his prior position and claims there is no prejudice because the issue was fully litigated. Although we believe the employer and Teamsters would have introduced other evidence relating to unit considerations if it were belived to be a live issue, we are not inclined to base a reversal on this ground since the issue here, as we view it, is the motive for discharge, not whether the employer or Teamsters were correct in their interpretation of the contract.[2]

■ The standard applied by the Board was "that the parties had to show by *irrefutable* proof that their belief as to their respective rights and duties under the Teamsters' contract were made in good faith and *correct*." (Emphasis added.) We find this test to be erroneous. The burden of proof is upon the General Counsel and the Board to show an unfair labor practice, but even they are not held to such a high standard as irrefutable proof, much less the accused. The correct standard was followed by this court in Local No. 3, United Packinghouse Workers of America v. N. L. R. B., 8 Cir., 210 F.2d 325, 329, cert. denied, 348 U.S. 822, 75 S.Ct. 36, 99 L.Ed. 648, where we stated:

"As has been observed the burden of proof to establish affirmatively by substantial evidence that the discharges or refusals to reinstate were because of union membership and activities and for the purpose of dis-

2. One member of the three-man Board stated in his dissenting opinion that the majority concerned themselves with a problem not presented in the case, i. e., whether in fact the job was within the unit.

couraging membership in the union was upon the Board and this burden at no time shifted to the company. The fact that the employer may introduce evidence tending to show other reasons for discharge or refusal to reinstate does not mean that the employer has the burden of proof of establishing such alleged cause but the evidence is admissible and pertinent because it tends to disprove the allegations of the complaint. But whether such evidence be introduced or not it is still the duty of the Board to prove the allegations in the complaint by substantial evidence."

See National Labor Relations Board v. Brown & Root, Inc., 8 Cir., 311 F.2d 447, 454.

■ The asserted rule that the employer and the Teamsters must be both correct and in good faith as to their beliefs is also in error. We do not decide the correctness of the unit considerations here since the real issue is motive for discharge. A good faith belief, even if it turns out in fact to be incorrect, can be sufficient to refute a charge of unlawful discharge. See National Labor Relations Board v. Burnup and Sims, Inc., 5 Cir., 322 F.2d 57, 60; Snow v. N. L. R. B., 9 Cir., 308 F.2d 687, 691.

The fact that the General Counsel himself took the position that the crane job was included in the unit lends reasonableness to the conclusion that all the parties, including Johnson, were in good faith in their similar belief. Also pertinent in this respect is the observation by all concerned that the work to be performed by the overhead crane would not only do the work theretofore performed by Johnson with the crawler crane, but also work done by a lift truck operated by an employee who was a member of the bargaining unit. It was this good faith belief which led to the conclusion that Johnson could no longer continue in what was originally considered a temporary position at J Street since the basis for the temporary aspect ceased

to exist with the disposition of the sand plant.

■■ A careful examination of the record as a whole, including the findings and credibility findings of the Trial Examiner, convinces us that there is no substantial evidentiary support for the Board's conclusion that the Teamsters took any unlawful action to interfere with any right guaranteed Johnson by the Act or that it took any unlawful action to coerce Johnson to join the Teamsters union. There is no substantial evidence to support the conclusion that the employer's action complained of was for the purpose of encouraging or discouraging membership in any union.

The Board's order is vacated. Enforcement is denied.