**EDWARD FIELDS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 169, Docket 28240.

United States Court of Appeals Second Circuit.

Argued Nov. 14, 1963.

Decided Dec. 20, 1963.

Jonathan S. Liebowitz, New York City (Maurice Feldman, New York City, on the brief), for petitioner.

Robert A. Armstrong, Washington, D. C. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, Allison W. Brown, Jr., National Labor Relations Board, Washington, D. C., on the brief), for respondent.

Before LUMBARD, Chief Judge, and KAUFMAN and HAYS, Circuit Judges.

LUMBARD, Chief Judge.

Edward Fields, Inc., petitions this court pursuant to § 10(f) of the National Labor Relations Act, 61 Stat. 148 (1947), as amended, 29 U.S.C. § 160(f), to review and set aside a Board order enjoining certain unfair labor practices found and directing petitioner to bargain, upon request, with Local 55 as the exclusive representative of its employees. The Board cross-petitions for enforcement of its order. We modify the order as hereafter stated and grant enforcement of it so modified.

Edward Fields, Inc. manufactures carpets, window blinds and related products at a plant in New York City. Its wholly owned subsidiary, International Dye Works, operates a dye shop across the street, and a winding department on the premises of petitioner's plant. In June 1962 the petitioner and its subsidiary employed 27 production and maintenance employees. Prior to the events in question, neither the petitioner nor its subsidiary was unionized. During the latter part of May and the first week of June 1962, organizers for Local 55 met with employees of the petitioner and its subsidiary and distributed authorization cards. Fifteen of the employees signed union cards and mailed them to the union's office. On June 5, 1962, the union sent petitioner a letter, received June 6, in which it stated in part: "This is to inform you that the majority of your employees in all branches of your company have designated Amalgamated Union Local 55, Affiliated with District 5

as their agent for the purpose of collective bargaining." The union requested a meeting at the petitioner's office on June 11 for the purpose of negotiating a contract. On June 7, Elliott Fields, vice president of Fields, Inc., replied to the union's letter stating that the petitioner would "be glad to meet with you for the purpose of determining whether your union represents a majority of our employees, and to determine whether you have bargaining rights in their behalf." He suggested that the proposed meeting be held on June 13. On or about June 7, 1962, Elliott Fields posted a notice on the plant bulletin board which invited any employee to discuss "the union situation" with him in privacy.

Elliott Fields first learned of the union's organizational activities in late May 1962. About May 30 Elliott Fields called employee James Zanata to his office to ask whether he had been approached by the union. When Zanata replied in the affirmative and indicated an interest in the organization, Fields told him that he would not like to see a union in the factory. Later, about June 7, an employee, William Bernardini, came to plant manager Richard Miller and to Elliott Fields to request a wage increase and during the ensuing conversation Fields told the employee this would be impossible until the union situation was settled. There is testimony that when Fields asked Bernardini what he thought of the union, Bernardini replied he not only was not interested, but that he was not going to attend a union meeting for the employees which was to be held that evening at a nearby restaurant. Fields then asked Bernardini to attend the meeting for the purpose of collecting information and to report back the following day. The next day Bernardini reported to the plant manager, Miller, that at the meeting the employees sought to select three or four men who would sit with the union in bargaining with management. Miller relayed this information to Fields who indicated he already knew about it. Further, employee Joseph Militello testified that shortly after the employee meet-

ing of June 12, 1962, Elliott Fields called Militello to his office and asked him whether he or anyone else had signed a union card.[1] When Militello said he had not signed a card and was not aware whether his fellow employees had signed authorizations, Fields suggested that he "mingle in among the crowd * * * to find out what's going on with the union" and report back. Elliott Fields denied making a suggestion to any employee to spy on the union.

On June 11, four employees notified the plant manager, Miller, that they desired to see Elliott Fields on behalf of the other employees. The meeting, which was attended by Fields, Miller, and the employee committee, commenced early the afternoon of June 11 and lasted the rest of the day, the employees being paid for their time. Fields was informed that the employees didn't particularly want the union but there wouldn't be any alternative unless they received some assurance as to existing and prospective company policies. Thereafter, Fields and the employee committee reviewed various aspects of their current working conditions including sick leave, hospitalization benefits, posting of vacation schedules, pension plan for employees, pay raises, and the distribution of a booklet which would set forth company policy. Fields also indicated that if a union organized the plant, he would not continue to maintain the company policy of full employment during slack periods and the practice of paying for uniforms, providing free coffee and doughnuts, and the lenient policy on smoking. At the conclusion of the meeting the committee requested permission to hold a meeting in the plant so they could report to the other employees the results of the discussion and determine the preference of the men.

On the following morning a meeting was held for all the hourly paid employees. At the beginning of the meeting a majority of the employees signified that they had signed union cards; and the employee committee then reported on all the subjects that had been discussed with Fields and Miller the preceding day. Following the committee report, Elliott Fields was called to the meeting to answer questions concerning company policy. After Fields left, the committee asked for a vote as to the number who still preferred the union and this time a majority voted against it. Immediately following the meeting, employee Elroy Jones went to Fields' office to solicit help in preparing a petition repudiating the union. Fields dictated the heading for the petition and Jones circulated it among all the production and maintenance employees. Each employee was requested to sign the petition regardless of whether he had signed a union card. Twenty-four signatures were obtained and the petition was returned to Fields the same day.

Meanwhile, on June 11, the union filed a petition with the Board in which it requested certification as the representative of Fields, Inc. and its subsidiary employees. Petitioner received a copy of the union petition prior to June 13, the date set in Fields' June 7 letter for a meeting with the union. At the June 13 meeting the union representatives told Edward Fields, the company president, and Elliott Fields that Local 55 represented a majority of petitioner's employees. Elliott Fields replied that he was not aware the employees wanted a union or that the local in fact represented a majority. The union representatives refused to disclose the names of those who had signed union cards and consequently the petitioner's attorney Maurice Feldman announced that the petitioner would "not negotiate or do anything with the union until we have a vote with the National Labor Relations Board."

On June 19, representatives of the petitioner and Local 55 met at the Regional Office of the Board to discuss the

---

1. While the Board adopted the Trial Examiner's finding that this conversation took place shortly after the employee meeting at the restaurant on about June 7, we think it better to state the evidence according to the witness' testimony.

possibility of a consent election; however, when the parties could not agree on a date for the election, the union withdrew its representation petition and filed unfair labor charges.

Following the filing of charges by Local 55, the Board issued its complaint, which alleged violations by Edward Fields, Inc., of §§ 8(a) (1) and 8(a) (5) of the National Labor Relations Act, 61 Stat. 140 (1947), 29 U.S.C. §§ 158(a) (1) (5). Section 8(a) (1) provides that it shall be an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in" § 7 of the Act. The relevant part of § 7 confers on employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other material aid or protection * * " 61 Stat. 140 (1947), 29 U.S.C. § 157. Section 8(a) (5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees * * * "

After a hearing, the Trial Examiner concluded that the petitioner, by unilaterally promising its employees changes in their working conditions and other benefits, together with its interrogation of employees and the suggestion they engage in surveillance of organizational activities, violated § 8(a) (1). He further found that the petitioner refused to bargain collectively in good faith with Local 55 in violation of § 8(a) (5). The Board accepted the Examiner's findings of violations of §§ 8(a) (1) and (5) but in addition found petitioner also violated § 8(a) (1) by unilaterally promising to grant its employees July 4 as an additional paid holiday and threatening to deprive its employees of accrued vacation rights. It issued the usual order requiring petitioner to cease and desist from refusal to bargain with Local 55, unilaterally changing working conditions and engaging in other activities to induce the employees to abandon their membership in the union and interfering with the organizational rights of the employees. It also ordered the petitioner to bargain with the union and post the appropriate notices.

We grant enforcement of subdivisions 1(b) through 1(e) and subdivision 1(h) of the order which enumerate the activities from which petitioner must cease and desist. Enforcement is also granted for subdivisions 1(f) and 1(g), except the phrase "to induce them to abandon their membership in the Union" will be added at the end of each subdivision. We set aside subdivision 1(a) which requires petitioner to cease and desist from refusing to bargain collectively with the union, and subdivision 2(a) which requires petitioner to bargain, upon request, collectively with the union as the exclusive representative of all employees in the appropriate unit, and embody in a signed agreement any understanding reached. The notice required by subdivision 2(b) will conform with the order as modified.

*Violations of § 8(a) (1).*

1. Interrogation of employees.

 The company does not deny that Elliott Fields questioned employees Zanata, Bernardini and Militello with respect to their union sympathies, but justifies the interrogations because each inquiry was isolated and unaccompanied by any threat or promise of benefit and done because of the inherent uncertainty of the union's claim of majority status. This poses the question whether the facts fall within the doctrine of Blue Flash Express, Inc., 109 N.L.R.B. 591 (1954) which permits questioning of employees under proper safeguards. The criteria announced in that case require that the employer (1) have reason to conduct the interviews, (2) advise the employee of the reason for the inquiry and (3) there be no threats or promises of benefit. Bon-R Reproductions, Inc. v. N. L. R. B., 309 F.2d 898 (2 Cir. 1962). Elliott Fields neither advised his employees that the purpose of his inquiry was to resolve his doubts as to the union's majority

status nor did he in fact have reason to question employees Zanata and Militello since the record reveals the former was questioned prior to the union's claim of representation, and the latter apparently was interrogated after circulation of the withdrawal petition. Since the proper safeguards of the Blue Flash doctrine have not been met, we must determine whether, under the circumstances, the interrogations come within the principles expressed in N. L. R. B. v. Syracuse Color Press, Inc., 209 F.2d 596 (2 Cir. 1954). There the court recognized the language of the specific questions, as to union membership, was not intimidating in itself, but the interrogations became coercive when conducted by a highly placed official in his office and at his request. Similarly, the facts in the instant case reveal that the interrogations were by Elliott Fields and, with the exception of employee Bernardini, the inquiries were made in Fields' office and at his request. All these circumstances must be considered in determining whether the actual or likely effect of the interrogations upon the employees constitutes interference, restraint or coercion. The effect of the interrogation is often difficult to discern, but here, as in Syracuse Color Press, the question as to union membership prompted at least one employee to reply untruthfully. "Here is actual proof that the interrogation did, in fact, implant a fear that a truthful answer would be a matter of embarrassment * * *. The step from embarrassment to restraint or intimidation is a short one." N. L. R. B. v. Syracuse Color Press, Inc., supra, 209 F.2d at 600.

In view of the surrounding facts and circumstances, we conclude the interrogations referred to support the Board's order.

*Surveillance of union organizational activities.*

■■ Employees William Bernardini and Joseph Militello testified that Elliott Fields suggested they gather information concerning employee organizational activities and report back to him. However, this testimony was denied by Fields who testified he never asked any employee to spy on the union. The Board adopted the employees' version of the conversation. Although the responsibility for the determination of the existence of substantial evidence to support the findings and order rests with this court, the findings of the Board are not to be lightly disregarded. Universal Camera Corp. v. N. L. R. B., 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); N. L. R. B. v. Syracuse Color Press, Inc., supra. Viewing the entire record, we find substantial evidence to sustain the conclusion that the company committed an unfair labor practice in violation of § 8(a) (1) by suggesting that employees Bernardini and Militello gather information concerning union organizational activities. N. L. R. B. v. Pennsylvania Greyhound Lines, Inc., 303 U.S. 261, 270, 58 S.Ct. 571, 82 L.Ed. 831 (1938); N. L. R. B. v. Piezo Mfg. Corp., 290 F.2d 455, 456 (2 Cir. 1961); N. L. R. B. v. Clark Bros. Co., 163 F.2d 373, 375 (2 Cir. 1947).

*The employer's petition to withdraw from the union.*

■ The Board found the company violated § 8(a) (1) by drafting and participating in the circulation of a petition among the employees to induce their withdrawal from the union. The evidence viewed most favorably for petitioner reveals that at the conclusion of the meeting of June 11 between Elliott Fields and the employee committee, one of the employees asked Fields how the employees could be relieved of the obligations incurred by signing the union cards. Fields indicated that "if they got a petition up amongst the men themselves, then this may help to revoke their signature cards." The next day when Elliott Fields was called into the employee meeting, the question of previously signed union authorization cards again was raised. Fields reiterated his belief that only the signing of a petition would relieve the men from the obligation of the cards. Following this meeting, employee Elroy Jones went to Fields' office

and requested information on how to word the petition. Fields called in his secretary and dictated the petition to her. Jones then took the petition and circulated it among all the employees who were working that day, indicating that everybody had to sign the petition regardless of whether they previously had signed a union card. When 24 signatures were obtained, Jones returned the petition to Fields. The assistance given by Fields in counseling and preparing the necessary papers for union disaffiliation, together with his authorization of its circulation among the employees might properly be found part of an anti-union campaign and in violation of § 8(a) (1). N. L. R. B. v. Decker, 296 F.2d 338, 340 (8 Cir. 1961); N. L. R. B. v. Marcus, 272 F.2d 253, 254 (2 Cir. 1959); N. L. R. B. v. Newton Co., 236 F.2d 438, 442, 444 (5 Cir. 1956); N. L. R. B. v. Charles R. Krimm Lumber Co., 203 F.2d 194, 196 (2 Cir. 1953); N. L. R. B. v. Epstein, 203 F.2d 482, 484 (3 Cir. 1953).

*Negotiating with employees to discourage union affiliation.*

■■■■ During the course of Elliott Fields' meeting with the employee committee and his later appearance at the employee meeting of June 12 he answered questions concerning current and prospective policy on working conditions. Without taking into consideration the Board's findings concerning those promised benefits which petitioner alleges either were not supported by evidence or were already a part of existing company policy, there is substantial evidence in the record to support the conclusion reached by the Board. Further, there is uncontradicted testimony that Fields said union recognition might result in less employment for the men during the slack periods, more stringent work rules and loss of existing benefits. In bargaining with a committee of employees and unilaterally promising various benefits at a time when a union was organizing and seeking recognition, and further suggesting the possible loss of existing privileges if the union was successful, the

company clearly interfered with the employees in the exercise of rights guaranteed in § 7 of the Act. N. L. R. B. v. Pyne Molding Corp., 226 F.2d 818 (2 Cir. 1955); N. L. R. B. v. Stow Mfg. Co., 217 F.2d 900 (2 Cir. 1954), cert. denied, 348 U.S. 964, 75 S.Ct. 524, 99 L.Ed. 751 (1955); N. L. R. B. v. Jamestown Sterling Corp., 211 F.2d 725 (2 Cir. 1954); N. L. R. B. v. Cousins Associates, Inc., 283 F.2d 242 (2 Cir. 1960).

*Violation of § 8(a) (5)—refusal to bargain.*

The petitioner characterizes the Board's finding with respect to its refusal to bargain with the union as "wooden reliance" on the doctrine of Joy Silk Mills, Inc. v. N. L. R. B., 87 U.S.App. D.C. 360, 185 F.2d 732 (1950). We agree. There the union requested recognition and offered the employer the opportunity to cross-check membership cards. This invitation was declined. Thereafter tentative arrangements were made for a consent election. During the pre-election period the employer engaged in aggravated violations of § 8(a) (1) of the Act. The court based its finding of failure to bargain on a rule enunciated by the Supreme Court that where an employer refused to bargain collectively with a majority union, and the union loses its majority status because of the employer's coercive activities, it is appropriate for the Board to order the employer to bargain with the union. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 435 (1944); N L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942); N. L. R. B. v. Bradford Dyeing Ass'n, 310 U.S. 318, 60 S.Ct. 918, 84 L.Ed. 122 (1940). But each of these cases and other cases cited by respondent may be distinguished on the facts from the instant case.

■■■ It is uncontradicted that at the June 13 meeting the petitioner's representatives repeatedly asked for evidence to support the claim that the union represented a majority of its employees. This request was refused even though the petitioner's representatives stated

that they would negotiate with the union upon proof it represented the employees. Petitioner was justified in its doubt as to the union's majority status since the employees' committee opened its meeting with Elliott Fields on June 11 by expressing the employees' distaste for the prospect of union representation. Nor did the signing of the union disaffiliation petition on June 12 give the company notice that the union had actually signed up a majority of its employees, since all were asked to sign irrespective of having previously signed a union authorization card. Consequently, on the record as a whole, there is insufficient evidence to show that the petitioner did not in good faith entertain doubt as to the union representation of a majority of its employees. Whatever the company may have done to encourage the employees not to look to Local 55 to represent them, on the facts of this case to require it to bargain with this union would be a remedy going far beyond the necessities of the situation; it would disregard the paramount rights and interests of the employees. See N. L. R. B. v. Superior Fireproof Door & Sash Co., 289 F.2d 713, 724 (2 Cir. 1961).

This is not a case in which the employer refused an offer by the union to examine signed authorization cards, N. L. R. B. v. Dahlstrom Metallic Door Co., 112 F.2d 756 (2 Cir. 1940) or a case in which the employer knew at one time that the union had a majority and then later merely suspected it had lost its majority. Medo Photo Supply Corp. v. N. L. R. B., 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007 (1944). The employer cannot be held for refusal to bargain on the ground that he himself destroyed the union majority by his unfair labor practices when he was unaware at the time the unfair labor practices were committed that the union at any time had a majority. The employer is free at all times to demand proof as a condition of bargaining. The duty to bargain arises only at such times as the union representative presents convincing evidence of majority support. N. L. R. B. v. Dahlstrom Metallic Door Co., supra. Further, there is no authority for the proposition that a violation of § 8(a) (5) may be predicated merely on evidence that an employer bargained with a minority group at a time when a union demanded recognition. In such circumstances, the decision as to violation of § 8(a) (5) must depend on whether the employer had a good faith doubt as to majority status. Otherwise he would be guilty of refusal to bargain even though there was no duty to bargain.

Accordingly the Board's order is modified as above stated, and enforcement is granted of the order so modified.