**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**SECURITY PLATING COMPANY, Inc., Respondent.**

No. 19702.

United States Court of Appeals
Ninth Circuit.

Feb. 15, 1966.

Rehearing Denied March 25, 1966.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Marcel Mallet-Prevost, Asst. Gen. Counsel, Gary Green, Paul M. Thompson, Attys., National Labor Relations Board, Washington, D. C., for petitioner.

Richard A. Perkins, Beverly Hills, Cal., for respondent.

Before BARNES and KOELSCH, Circuit Judges, and CRAIG, District Judge.

KOELSCH, Circuit Judge.

The National Labor Relations Board has petitioned this court to enforce its order issued against Security Plating Company (Security) on June 29, 1964.

The Board's order, which adopted the recommendations of the Trial Examiner, directed Security to offer to reinstate and make whole two former employees, to recognize Local 67, Metal Polishers, Buffers, Platers & Helpers International Union, AFL–CIO (Union), as the collective bargaining representative of its production and maintenance employees, to cease all coercion and restraint of said employees in the exercise of rights guaranteed them by Section 7 of the Act, (29 U.S.C.A. § 157), and to post the usual notices.

In early July 1963, the Union commenced a campaign to organize Security's production and maintenance employees, and by July 19 had succeeded in securing the signatures of a majority of the employees on authorization cards designating the Union as their collective bargaining representative. By a letter dated July 16, 1963 and received on July 19, the Union informed Security of its majority status and demanded a meeting to negotiate a labor agreement. Security made no response. Instead, it immediately approached several employees who were supporting the Union and urged them to cease their activities and withhold any support. It pointed out that representation would be an expense to both employee and employer and argued that neither would receive any real benefit. It threatened to close the business if the Union was successful. On the other hand, it promised to improve working conditions as soon as its financial condition permitted. Then on August 1, the employees held a meeting at which Fred Fischer, a principal owner and general manager, spoke. He urged them to revoke their prior Union authorization. A ballot was taken and, just as it was announced that the result was in favor of Union representation, Fischer received a telegram from the Union protesting any such election. He thereupon angrily accused the employees of having a "stool pigeon" among them and again threatened to close the shop. A second ballot was then taken, but this time only one vote was cast in favor of representation. The next day Security discharged Badillo, and this was shortly followed by the discharge of Palmer.

Security urges that the evidence is insufficient to support the Board's order. N.L.R.B. v. Mrak Coal Co., 322 F.2d 311, 313 (9th Cir. 1963); Snow v. N.L.R.B., 308 F.2d 687, 691 (9th Cir. 1962). But an examination of the entire record convinces us the respondent is mistaken.

Security first attacks the Board's finding that it refused "to bargain collectively with the representatives of his employees" and thus violated Section 8 (a) (5) and (1) of the Act. Security argues that the Union did not represent a majority of the employees and, in the alternative, even if it did, the employer entertained a good faith doubt as to the Union's majority status, justifying a refusal to bargain. Security does not deny that the necessary number of employees did sign the authorization cards, or that representative status can be created by such cards alone. See United Mine Workers of America v. Arkansas Oak Flooring Co., 351 U.S. 62, 71–72, 76 S.Ct. 559, 100 L.Ed. 941 (1956). Rather, it contends the cards do not reflect the real intention of many of those who signed because the cards were in English, a language which they were unable to read and that the Union organizer misrepresented the cards as simply a necessary preliminary to an election. The most that can be said in support of the argument is that there was some evidence to

that effect. However, there was also evidence that the meaning and import of the cards were carefully and correctly read and explained to such employees in a language that they understood.

■ Respondent's next argument presents a more difficult question. It rests on the now well established rule that a good faith doubt of a union's majority status will excuse an employer's failure to recognize and bargain with a union. N.L.R.B. v. Hyde, 339 F.2d 568, 570 (9th Cir. 1964); Snow v. N.L.R.B., supra, 308 F.2d 691; N.L.R.B. v. Trimfit of California, 211 F.2d 206, 209 (9th Cir. 1954); Fort Smith Broadcasting Co. v. N.L.R.B., 341 F.2d 874 (8th Cir. 1965). The rule does not operate unless it appears that employer had a bona fide doubt at the time the majority union was denied recognition. The refusal may not be motivated by a desire to forestall collective bargaining and provide an opportunity to undermine the union's majority status and rid the company of the union.

■ In the instant case Security received notice on July 19 that the Union was the majority representative and demanded collective bargaining. On this date, the Union was in fact majority representative, although it was not on the date the letter bore, July 16. However, a request to bargain is effectual only upon receipt. The Union's status on the day the letter was sent is not material. Allegheny Pepsi-Cola Bottling v. N.L.R.B., 312 F.2d 529, 532 (3d Cir. 1962). Security did not contact the Union as requested in the letter but instead sought to influence its employees to withdraw authorization. Security now argues vigorously that the Union's Petition for Certification as Representative, filed with the N.L.R.B. Regional Office on July 17, raised a good faith doubt, justifying its refusal to bargain. Security also states the Union's failure to present proof of majority status induced doubt. For the latter proposition, the employer cites Edward Fields, Inc. v. N.L.R.B., 325 F.2d 754 (2d Cir. 1963). This case is distinguishable in that the employer in *Fields* "repeatedly asked for evidence to support the [majority status] claim" and "this request was refused." Id. 760. Furthermore, our own Circuit has stated, "there was no necessity for the union to offer proof of the genuineness of its majority claim absent a challenge by respondent [employer]." N.L.R.B. v. Trimfit of California, supra, 211 F.2d 210.

N.L.R.B. v. Dan River Mills, 274 F.2d 381 (5th Cir. 1960) is quoted at length by respondent in support of its argument that the Representation Petition justified a good faith doubt of the Union's status. The facts in that case are similar to our own—a Representative Petition was filed just prior to receipt of the Union's letter to the employer stating it had majority status. In the *Dan River* case a good faith doubt was found by the court, but there were certain controlling facts not present here. In that case "the employer immediately * * * disputed [the union's majority status]" by expressly stating its doubt in a letter to the Union and the Board. Here, Security did not dispute the Union's claim. Its only reaction to the letter requesting recognition was an immediate anti-Union campaign. Such action tends to indicate an implicit acknowledgment of the Union's power. Under similar facts, the court in N.L.R.B. v. Overnite Transportation Co., 308 F.2d 279, 283 (4th Cir. 1962) stated:

> "In this case the evidence unmistakably demonstrates that the company gave some credit to the union's claims, for [the managers] began their course of unlawful interrogations and speeches immediately, upon receiving the union's * * * telegram and * * * letter, requesting recognition and bargaining. This course of conduct is an absolute refutation of any good faith doubt on the part of the Company."

■ Considering all the facts, the Board was not in error in finding Security's refusal to bargain was not based on a good faith doubt.

■■ Respondent next contends that the discharge of Palmer and Badillo was

not discriminatory; it argues that Palmer was discharged for "sabotaging" machinery and Badillo for slow and inefficient job performance. However, the Board affirmed the Trial Examiner's conclusion that these employees were discharged to discourage Union membership and activity in violation of Section 8(a)(3) and (1). As stated by this court in Wells, Inc. v. N.L.R.B., 162 F.2d 457, 460 (1947), and reiterated in N.L.R.B. v. Texas Independent Oil Co., 232 F.2d 447, 450 (9th Cir. 1956), "the existence of some justifiable ground for discharge is no defense if it was not the moving cause." See Radio Officers, Union, etc. v. N.L.R.B., 347 U.S. 17, 74 S.Ct. 323, 98 L.Ed. 455 (1954). We have before us conflicting evidence as to why the employees were dismissed.[1] Since a consideration of the record as a whole convinces us there is substantial evidence supporting the Petitioner, we are precluded from further inquiry.

 The Board also found Security violated Section 8(a)(1) by frustrating the employees' rights guaranteed by Section 7. The essence of the latter is, employees shall have the right to organize and bargain collectively. American Ship Building v. N.L.R.B., 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965). Subsection (a)(1) of Section 8 is a broad provision making it an unfair practice for an employer to interfere with, restrain or coerce employees in organizing and bargaining, as guaranteed by Section 7. Here, there was evidence that Security questioned employees about their union activities, implied that union activities were under surveillance, made threats, and made promises of benefits if the Union were defeated. The opinions or arguments that it expressed were more than those authorized by Section 8(c) or the

First Amendment to the Constitution. Rather, they constituted a prohibited anti-union campaign.

The order will be enforced.

---

[1]. Palmer offered uncontradicted testimony that Fischer told her at the time of her discharge that she had failed to cooperate in ridding the company of the Union. Prior to this time, Fischer had sought Palmer's help in defeating the Union. On the other hand, Palmer denied she had tampered with certain machinery as claimed by Security. The evidence pertaining to Badillo showed that she had been warned not to support the Union and that Fischer was aware of her subsequent vote for the Union on August 1. The next day, Badillo was discharged. There had been no previous complaint to Badillo that she was slow and inefficient.