**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**RIVER TOGS, INC., Respondent.**

**No. 521, Docket 30991.**

United States Court of Appeals Second Circuit.

Argued June 7, 1967.

Decided July 27, 1967.

Robert A. Giannasi, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., for petitioner.

Bertrand B. Pogrebin, Harry H. Rains, Mineola, N. Y., for respondent.

Before MOORE, FRIENDLY and ANDERSON, Circuit Judges.

FRIENDLY, Circuit Judge:

By petition dated December 23, 1966, the National Labor Relations Board sought enforcement of an order issued July 1, 1966, 160 N.L.R.B. No. 2, finding that River Togs, Inc. had violated § 8 (a) (1), (3) and (5) of the National Labor Relations Act in the course of a union organizing campaign in the winter and early spring of 1965. We grant enforcement as to most of the § 8(a) violations but deny it as to others and as to the violations of § 8(a) (3) and (5).

River Togs, solely owned by Salvatore Avellino, Jr., has a plant at Riverhead, Long Island, where it acts as a contractor, receiving materials from jobbers to sew into dresses according to their specifications, for which the jobbers pay a flat fee per garment. River Togs followed a "complete section" procedure whereby each employee performed only a single operation on a garment; this required frequent transfers or lay-offs, especially in the skirt department. A number of the employees were of Polish origin and several had little or no knowledge of English. During February 1965, Local 107, International Ladies Garment Workers Union, began an organizing campaign in Suffolk County. It held dinner meetings of River Togs' employees on March 3, 10 and 15, at the Henry Perkins Inn at Riverhead, with the Union providing the meals and Edward Banyai, the manager, addressing each meeting.

*Section 8(a) (1).*

On March 10 "Billie" Mastrioni, a supervisor, asked Alice Wright where she was going that night and, on receiving an evasive answer, inquired whether Wright was attending a union meeting. An employee, James Tolar, attended the meeting with a camera and sought unsuccessfully to take pictures. Next morning Mastrioni addressed the employees over the plant loud-speaker. She recounted a telephone call in which Avellino had said that he knew who had attended the meeting, that he would close the plant before he would "join a union," and that any employee who wanted a union could leave the plant. Toward the end of the working day Avellino encountered Tolar in front of supervisor Martin and four other employees. Avellino asked Tolar if he had the pictures, reproached him for not getting them, inquired how he knew there was a union meeting, suggested he not "buy a house because you can't buy a home if you don't have a job and none of us will have a job," and told Martin "this guy is a

ringleader." [1] We uphold the Board's conclusion that these incidents constituted violations of § 8(a) (1).

On March 11 Banyai wrote River Togs that the Union had been duly designated as collective bargaining representative by a majority of the employees and requested a meeting for negotiations. Upon receiving the letter the following day, Avellino promptly telephoned Banyai who offered to show authorization cards signed by a majority; Avellino took the position that since the company had been losing money, he would be forced to close the plant if the Union persisted in its organizing efforts unless it got him a "union jobber" since they paid higher fees per garment. Banyai informed him that the Union had filed a petition with the NLRB for an election and asked if Avellino would consent; the latter did not commit himself. The two men arranged to meet for lunch at a restaurant on March 17.

Immediately after this talk Avellino met some employees who asked what he was going to do about the Union and said they didn't want to join. He told them not to worry "because right now I'm not joining the union either," and inquired how the cards had come to be signed. One employee said he had signed in order to obtain a meal the Union had furnished. The two supervisors also reported that "the girls were under the impression that they were signing these cards for a dinner."

 Avellino called the employees together on March 15. He told them he knew that most of them had attended Union meetings and that a meeting would be held that night at the hotel; he advised them to attend and ask what the Union was going to do to get work for the plant. He put the question how, since "a lot" of the employees were still unable on a piece-work basis to "make" the statutory minimum wage of $1.25 per hour, they could make the Union's minimum of $1.75 or $1.80, a figure which

only five operators were sufficiently skilled to attain. He said it would take months to find a "union jobber" and he could not pay union benefits on the fees received from non-union jobbers; on the other hand he would have no objection to the Union and would recognize it if it got him a "permanent registration" with a union jobber. He asked several employees to tell their experience in union shops; they reported these had closed down. When some of the workers said they were "against" the Union, Avellino ended the discussion, saying he was "not interested."

The Trial Examiner found this speech did not violate § 8(a) (1). The Board disagreed, concluding that it created the impression of surveillance and constituted a threat of reprisal. While the disagreement did not result in any change in the order, see fn. 11 to the Board's opinion, we would not wish to be understood as approving the Board's finding of a threat of reprisal. Avellino's statements as to the economic effect of unionization are the kind of speech protected by § 8(c). Rather than being threats of reprisals to be imposed because of the employer's anti-union bias, these remarks were a prediction as to the likely economic consequences of unionization. Compare NLRB v. Cousins Associates, Inc., 283 F.2d 242, 243 (2 Cir. 1960). Furthermore—and this distinguishes NLRB v. Miller, 341 F.2d 870, 872–873 (2 Cir. 1965), on which the Board relies— Avellino had a reasonable basis for his fears, in ILGWU's well-known minimum wage standards, the poor performance of his workers, his already dim economic picture, and the difficulty of making connection with union jobbers, none of which facts are disputed; and he explained these considerations so that the employees could make their own evaluation. His lack of general anti-union animus was evidenced by his statement that he would have no objections to the Union and would recognize it if it got him the arrangement with a union jobber

---

1. Avellino denied he had sent Tolar to the meeting to take pictures and claimed he

was merely teasing. However, the Board was entitled to draw a different inference.

needed to continue operation of the plant with union benefits. Although the Board apparently thinks workers should be shielded from such disconcerting information, an employer is free to tell his employees what he reasonably believes will be the likely economic consequences of unionization that are outside his control, as distinguished from threats of economic reprisal to be taken solely on his own volition. Cf. Bok, The Regulation of Campaign Tactics in Representation Elections under the National Labor Relations Act, 78 Harv.L.Rev. 38, 77–82 (1964). If § 8(c) does not permit an employer to counter promises of pie in the sky with reasonable warnings that the pie may be a mirage, it would indeed keep Congress' word of promise to the ear but break it to the hope.

The next § 8(a) (1) violation found was this: On March 16 two employees came into the office of Lillian Andreasen, the sole office worker at River Togs. They asked for two pieces of paper so that they might circulate anti-union petitions. When Andreasen complied, one of the employees explained that her own hand-writing was poor and asked Andreasen to write out the petition, incorporating the substance of what the employees wanted to say. She did.[2] Two employees (including one of those who had gone to Andreasen's office) then solicited signatures during the coffee break and for 15 minutes thereafter. The two supervisors, Mastrioni and Martin, were in the shop, saw the petition being circulated and did nothing to interfere.[3] One of the employees later brought the petitions, signed by twenty-six employees,[4] to Andreasen to put in the files; when she refused to receive the paper, it was given to Mastrioni.

The Board properly makes no claim that respondent initiated or actively encouraged the preparation and circulation of the petition, as in NLRB v. Movie Star, Inc., 361 F.2d 346, 348–349 (5 Cir. 1966), and NLRB v. S & H Grossinger's Inc., 372 F.2d 26, 39 (2 Cir. 1967), which ·it nevertheless cites to us. Neither does the evidence go so far as in Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760 (2 Cir. 1963), where the employer advised the employees how to nullify the previously signed cards and dictated the petition and an employee told the others that everybody had to sign. Even if respondent were chargable for what Andreasen did, which we doubt, compare NLRB v. Newton Co., 236 F.2d 438, 442 (5 Cir. 1956), she simply made a courteous response to the request for two pieces of paper and for her talents as a scribe. Although the issue is close, we think the evidence does not fairly support a conclusion that the supervisors' action or inaction created an impression that the petition was company sponsored or that any reprisals would follow from failure to sign it. Their activities came nowhere near what was held sufficient to warrant a finding of a "combined" violation of § 8(a) (1) and (2) against the employer in Irving Air Chute Co. v. NLRB, 350 F.2d 176, 179–181 (2 Cir. 1965). The most that can be fairly inferred is that their action was taken by the employees as a manifestation of their view that unionization would be detrimental, a position already well known.

### Section 8(a) (3).

When the meeting between Banyai and Avellino on March 17 proved unproductive as we shall later recount, the Union established a picket line. A job-

2. The petition said that the signers wanted it known that they "do not wish to join a union of any kind and prefer working in a shop which is non-union," also that they were "being treated fairly by River Togs, Inc., and see no reason for a change in status."

3. The Board went beyond the Trial Examiner in finding that the two supervisors spoke to the two circulators; if this is meant to indicate that the conversation was an encouragement to circulate the petition, we think it unsupported. And the Trial Examiner's statement at fn. 12 that one employee, Kotun, testified she signed the petition for fear of a supervisor who was standing behind her is not supported by anything in the Joint Appendix.

4. At least six of these had previously signed union authorization cards.

ber had withdrawn 1000 uncompleted dresses with separate skirts, and the work scheduled on these garments disappeared along with them. Frances Kozak, Vera Gaines and Angelina Dixon were laid off on March 19, Carol Kotun on March 22, and Rose Mayo and Cecile Adair on March 24, each after she finished the skirts that had been assigned to her. All had signed union cards but Dixon and Kotun had also signed the anti-union petition. Avellino testified that, with the withdrawal of the 1000 dresses, the plant had only 6000 garments to manufacture, none of these having separate skirts; that since production ran from 2000 to 2500 dresses per week, there would thus be no need for skirt operators for two or three weeks; that he also decided to change to a "semi-section" operation where each employee would perform several operations on the same garment; and that this constituted an added reason to lay off the skirt operators, retrain the other employees, and later recall the former for retraining when work became available.[5] All the laid-off employees except Kotun and Adair were primarily skirt-makers; Kotun operated a "merrow" machine [6] and the dresses remaining in the plant did not require merrowing. Dixon was recalled to work, after a week-end, on March 22 [7] and Gaines on April 9. Kozak was notified to report on April 12 but did not. Adair was instructed to report on April 15 and she and Kotun returned on April 19. Mayo was recalled on April 26 but was discharged for cause three days later.

General Counsel claimed that since there turned out to be enough work for the force existing on March 19—indeed with one or two new employees having been hired—Avellino's failure to keep the five employees and retrain them for semi-section operation simultaneously with the others was enough to prove a violation of § 8(a) (3). The Trial Examiner rejected this, stressing that the change to semi-section was motivated by economic considerations and that the employees were laid off at different times as their skirt work ran out. He added as a makeweight that if anti-unionism had been the basis of the layoffs, Avellino would have been more likely to dispense with poor producers who had signed cards than with Gaines and Kotun who were superior ones. The Board overturned the Examiner's finding saying, "We are not persuaded that Respondent laid off these five employees because there was no work for them."

While the Board's phrasing was doubtless inadvertent, the slip fairly indicates its attitude; in truth it placed the burden of proof on respondent rather than on the General Counsel as the Trial Examiner had correctly done. On its face a few weeks lay-off of five of 49 employees incident to a substantial withdrawal of work and a changed method of operation which required retraining would seem an unpromising candidate for a finding of discriminatory discharge. The difficulty was augmented by the circumstance that while all five had in fact signed union cards, there was no specific evidence that respondent knew this. The only laid-off employee who was known to have been an active union promoter was Mrs. Kozak, and Avellino's knowledge of who had attended the union

---

5. When Mayo was laid off, she was told that the employees would be recalled "one at a time" for retraining and that she probably would be recalled the following week. Kotun and, through her, Kozak were told that "there wasn't any work" but that when it did come in, they would be called. When Gaines, Kotun and Mayo were laid off, they were asked to write their names and telephone numbers on slips of paper. Adair was not called as a witness.

6. We accept the Board's conclusion that Mastrioni's statements that the removal of Kotun's merrow machine and two others was "because of the union" and that the skirts were going back because "that's the way you want it," violated § 8(a) (1), although a slightly fuller explanation would have been permissible.

7. The General Counsel did not contend that Dixon's layoff was discriminatory.

meetings, stressed by the Board, is of little significance since most of the employees had done so. General Counsel submitted no evidence that other employees who had not signed union cards would have been more logical candidates for layoff; his case consisted rather in holding the employer to a standard, which the Board adopted, of rebutting every possible inference consistent with discrimination. While in such a situation we would ordinarily remand the matter to the Board for redetermination according to the proper legal standard, we need not do this when there is not substantial evidence to support a finding of violation in any event. This phase of the case is appropriate for applying the Supreme Court's teaching that while "the 'substantial evidence' standard is not modified in any way when the Board and its examiner disagree," nevertheless "evidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 496, 71 S. Ct. 456, 469, 95 L.Ed. 456 (1951). Cf. NLRB v. James Thompson & Co., 208 F. 2d 743, 745–746 (2 Cir. 1953). We thus deny enforcement as to the alleged § 8 (a) (3) violation.

### Section 8(a) (5).

The meeting between Banyai and Avellino arranged in their telephone talk of March 12 took place on March 17, Banyai being accompanied by Koozman, another Union representative, and Avellino by one Del Mastro, neither of whom testified. Avellino began by reiterating his demand that the Union furnish him a union jobber. Del Mastro then sought a delay until Avellino's father, who he claimed was the financial angel of the business, left the hospital where he was confined by a heart attack. Banyai demurred because of the petition. Avellino countered that the Union was having four or five people go around the shop

and disrupt production, that a jobber whom he had told of his union problem had already instructed him to start sending work back, and that if the Union continued, he would have to close. When Banyai asked whether he would admit the Union had a majority of the cards or would consent to a card check, Avellino declined. According to Banyai, Avellino claimed "that what we [the Union] did was get the majority of the people signed for a duck dinner. That if he would give the people a dinner, they would all sign for him," and that if he "told the people what they were signing, you wouldn't have any cards." Avellino's version was that he said the Union had obtained the cards "under false pretenses," that it "didn't have the proper vote," that a number of girls had signed the petition against the union, and that he had been told "the union had a Polish girl interpreting for the Polish girls I have that don't speak English, telling them to sign the cards." The conversation ended with Avellino's saying, "Well, you give me a union jobber with a registration and I'll run the best union shop on Long Island."

The Trial Examiner found that there were 49 employees in the appropriate unit and that the Union had 27 authorization cards. Respondent challenged the validity of the cards signed by three Polish speaking women, Helen Rodziewicz, her sister Janina Kurosz, and Jadwiga Suchto, on the ground that their unfamiliarity with English prevented them from knowing what they were signing, and of those signed by two men on grounds properly ruled to be insufficient. The Trial Examiner upheld the validity of the cards signed by the three women; the Board sustained Suchto's and found it unnecessary to pass on the other two.

If decision turned on the issue, we would entertain a good deal of doubt as to the validity of the cards signed by all three of the Polish workers. It is undisputed that these ladies could not understand either the card or the speeches at the Union meeting. The Examiner upheld the validity of the cards on the basis

of testimony that Banyai paused during his talk for interpretation, which he was warranted in finding, and that an adequate explanation was made by the translators, which is much more dubious. Mrs. Kurosz testified that she went to the meeting on Mrs. Kozak's representation that everyone had to come; that after the dinner Banyai and a Mrs. Rhatigan, a Union organizer, told her she had to sign the card; that a bilingual cousin who had accompanied her filled out the card but made no explanation at the time; and that her first knowledge of what she had done came on her way home from the meeting when the cousin told her "that the card was for the union, they wanted to know how many." Helen Rodziewicz' testimony was in accord, and the cousin was not called. Jadwiga Suchto testified that she had attended the meeting on Mrs. Kozak's representation that all the workers were going and that "they gave me the card and they told me to sign my name and address and there was a Polish person there [Mrs. Kozak] and they told me, they wanted to know how many people were there and they filled out the rest." [8] She said that during the meeting she asked Mrs. Kozak what Banyai was saying but was put off. On the other hand Mrs. Kozak testified she had explained to the Rodziewicz sisters before the meeting that it would be about a union adding, when they did not understand this, that "when it comes in, the prices, you know, you might get better prices and you might make more pay." She claimed that Mrs. Suchto had volunteered to attend the meeting and had sought an explanation of the card and help in filling it out, in response to the former of which requests Mrs. Kozak "just said it's a card that if we get more cards and if the people that want a union sign, then we could get a union; the more cards there is, the better it is." Mrs. Kozak also said she had explained Banyai's speech to Mrs. Suchto during his pause [9] and saw the Rodziewicz sisters conversing with their cousin. Her daughter, Carol Kotun, filled in that Mrs. Kozak, interpreting Banyai's remarks to Mrs. Suchto, explained "that the union would be a much better thing for the people in the shop. They would get better wages, benefits would be extensive and Jennie said to her, 'Well fine, that's good. We would have a better job. The situation would be much better.' "

We must confess difficulty in understanding how on this record the Examiner could uphold the validity of the cards of the Rodziewicz sisters, whose testimony as to the circumstances of signature was not contradicted although their testimony as to what was said to them earlier and later was in some degree. And while we might have to sustain the crucial ruling as to Mrs. Suchto's authorization despite our grave doubts as to Mrs. Kozak's credibility, we think the Congress that passed the Taft-Hartley Act would have been mightily surprised to learn that a card signed even under the circumstances testified by the General Counsel's witnesses could endow a union with the right to represent all employees and require an employer to recognize it.[10]

8. Later testimony made it evident that "they" meant Mrs. Kozak.

9. The significance attributed to this is not clear since Mrs. Kozak's credited testimony was that Mrs. Suchto signed the card before Banyai began speaking.

10. While the Board cites NLRB v. Security Plating Co., 356 F.2d 725, 726–727 (9 Cir. 1966), for the proposition that inability to read the authorization card on the part of employees speaking only a foreign language is not fatal, the court there relied on "evidence that the meaning and import of the cards were carefully and correctly read and explained to such employees in a language that they understood"—a far cry from the situation here even if the testimony of Kozak and Kotun be accepted. The language of then Trial Examiner Arnold Ordman in Norlee Togs, Inc., 129 N.L.R.B. 14, 18 (1960), is more appropriate—"possibilities of misunderstanding were rife in this bilingual meeting." What was done here is in sharp contrast to the procedures in elections where, as a member of the Board has said with appropriate pride, notices "have

We are not obliged to decide this, however, since the Board's conclusion that respondent's refusal to bargain was not motivated by a good faith doubt—an issue on which the General Counsel has the burden of proof, see NLRB v. Great Atlantic & Pacific Tea Co., 346 F.2d 936, 939–940 (5 Cir. 1965); Sunset Lumber Prods., 113 N.L.R.B. 1172, 1175 (1955); John P. Serpa, Inc., 155 N.L.R.B. 99 (1965), reversed and remanded sub nom. Local 1179, Retail Clerks Union, 376 F.2d 186 (9 Cir. 1967); Strydel, Inc., 156 N.L.R.B. 1185 (1966); Aaron Bros., 158 N.L.R.B. No. 108 (1966); Hercules Packing Corp., 163 N.L.R.B. No. 35 (1967)—is not supported by substantial evidence on the record considered as a whole. The treatment of this issue both by the Trial Examiner and by the three-member panel of the Board was cursory. The Examiner began with a summary of Banyai's telephone talk with Avellino on March 12. If he considered this preliminary sparring to have anything more than evidentiary significance with respect to the refusal of March 17, he was in error; indeed it had precious little even as that. An employer is not to be cast in bad faith for equivocal spontaneous reactions to a union summons before he has had any opportunity to investigate the legitimacy of the union's demands; even if he does not doubt the union's assertion that a majority had signed cards, he is entitled to find out something about the circumstances. NLRB v. Dan River Mills, Inc., 274 F.2d 381, 387–388 (5 Cir. 1960), supports this view and we do not read the recent decision of a divided court in Local 1179, Retail Clerks Union v. NLRB, 376 F.2d 186 (9 Cir. 1967), as being to the contrary.

Turning to the meeting on March 17, the Examiner noted Avellino's questioning of the Union's majority but found lack of good faith doubt to be indicated by the concluding remark that if Banyai gave him a union jobber he would run "the best union shop on Long Island." We fail to follow this. If a union jobber were secured, Avellino could no longer argue to the employees that unionization might cost them their jobs and it would be reasonable to expect that a majority would be secured. Furthermore, in the context of Avellino's conversations with the Union and his employees, this statement is more reasonably interpreted as an expression of his willingness, given registration with a union jobber, to accept the Union if it were shown to represent a majority than as an admission that the Union already represented one.

The Board, after referring to respondent's "extensive antiunion campaign" and discriminatory layoffs, found without further discussion that its failure to accord recognition "was not in good faith, but rather was born of a desire to gain time to subvert the Union's majority and thwart unionization * * *." It may well be that our invalidation of some of the Board's findings of § 8(a) (1) violations and of its holding as to layoffs violating § 8(a) (3) would alone require us to reject this conclusion. But apart from that we see no logical basis for the view that substantial evidence of good faith doubt is negated solely by an employer's

been translated into almost every language on the linguistic spectrum, ranging from Spanish, Polish and German, through Yugoslavian, Russian, Chinese and Tagalog." Zagoria, The 25 Millionth Vote—A Milestone in Industrial Democracy, Feb. 23, 1967. As to unreliability and other difficulties of the card procedure, see generally Comment, Refusal-to-Recognize Charges Under Section 8(a) (5) of the NLRA: Card Checks and Employee Free Choice, 33 U.Chi.L.Rev. 387, 389–397 (1966); Comment, Union Authorization Cards, 75 Yale L.J. 805, 823–836 (1966);

Lesnick, Establishment of Bargaining Rights without an NLRB Election, 65 Mich.L.Rev. 851, 856–858 (1967). The Board itself has characterized authorization cards as "a notoriously unreliable method of determining majority status of a union." Sunbeam Corp., 99 N.L.R.B. 546, 550–551 (1952). Some indication of the degree of unreliability is afforded by the statistics in Chairman McColloch's oft-cited address, A Tale of Two Cities: or Law in Action, printed in Proceedings, Section of Labor Relations Law, American Bar Ass'n, pp. 14, 17–18 (1962).

desire to thwart unionization whether by proper or even by improper means. Avellino had much reason to doubt the Union's claim to a valid majority. In addition to the general unreliability of authorization cards and Avellino's belief that cards had been procured by repeated proffers of the fowl for which Long Island is famous, he knew of the antiunion petition and of the Polish speaking employees whose signatures were subject to question. His efforts to counter the Union, almost all of them prior to the March 17 meeting, were "as consistent with a desire to prevent the acquisition of majority status as with a purpose to destroy an existing majority." Lesnick, supra, 65 Mich.L.Rev. at 855. As Judge Learned Hand said in a similar context, his response "however unlawful in itself it may have been, throws substantially no light on how far he thought the effort had succeeded to form a union. As a penalty it might be proper, but as a link in reasoning it seems to us immaterial." NLRB v. James Thompson & Co., supra, 208 F.2d at 746.

Indeed, in some recent decisions not cited to us by either party [11] the Board seems to have somewhat moderated the position on good faith doubt taken in this case. In Furr's, Inc., 157 N.L.R.B. No. 38 (1966), enforced, 55 L.C. ¶ 11,734 (10 Cir. 1967), the Board explained its issuance of a bargaining order not in terms of the trial examiner's theory "that Respondent's refusal to recognize and bargain with the Union was not based on a good faith doubt as to its majority, but was for the purpose of gaining time to undermine the Union," but rather on the ground that the illegal activity of supervisors had made a fair election impossible, invoking the principle of Joy Silk

Mills, Inc., 85 N.L.R.B. 1263 (1949), enforced, 87 U.S.App.D.C. 360, 185 F.2d 732 (D.C. Cir. 1950). The full Board further considered the subject of good faith doubt in Aaron Bros., 158 N.L.R.B. No. 108 (1966), where the majority announced:

"Whether an employer is acting in good or bad faith in questioning the union's majority is a determination which of necessity must be made in the light of all the relevant facts of the case, including any unlawful conduct of the employer, the sequence of events, and the time lapse between the refusal and the unlawful conduct. Where a company has engaged in substantial unfair labor practices calculated to dissipate union support, the Board, with the Courts' approval, has concluded that employer insistence on an election was not motivated by a good-faith doubt of the union's majority, but rather by a rejection of the collective-bargaining principle or by a desire to gain time within which to undermine the union. However, this does not mean that any employer conduct found violative of Section 8(a) (1) of the Act, regardless of its nature or gravity, will necessarily support a refusal-to-bargain finding." [12]

In citing *Joy Silk Mills*, supra, to support the middle sentence, the majority added this significant comment:

"The rule of the *Joy Silk* case conforms to the Board's objective of utilizing the most reliable means available to ascertain the true desires of employees with respect to the selection of a collective-bargaining representative. Where an employer has engaged in unfair labor practices, the results

---

11. We are indebted to Professor Lesnick's article, supra, 65 Mich.L.Rev. at 852–856, for these references.

12. While on its facts the *Aaron Bros.* case did not present this issue, the employer having simply stated that he doubted the union's majority, without giving any reasons, and having demanded an election, the Board was rather obviously endeavor-

ing to clarify its general position in this area. It is not clear how far it succeeded in doing so. Contrast H & W. Constr. Co., 161 N.L.R.B. No. 77 (1966), and Converters Gravure Service, Inc., 164 N. L.R.B. No. 53 (1967), with Galbreath Bakery, Inc. and United Packinghouse, Food & Allied Workers, 163 N.L.R.B. No. 41 (1967). See also 31st Ann.Rep. 80–83 (1966).

of a Board-conducted election are a less reliable indication of the true desires of employees than authorization cards, whereas, in a situation free of such unlawful interference, the converse is true."

This comes close to saying that when the evidence shows than an employer has a good faith doubt of the union's majority, unfair labor practices directed at undermining the union will be given effect not so much as evidence effectively contradicting existence of the doubt, as to which their probative force is often slight, but rather as a violation of § 8(a) (1) so serious as to make a bargaining order an appropriate remedy. See Lesnick, supra, 65 Mich.L.Rev. at 854–855, 859–863. Such a position would accord not only with Judge Hand's statement in NLRB v. James Thompson & Co., supra, 208 F.2d at 746, but also with Judge Magruder's opinion in NLRB v. Hannaford Bros., 261 F.2d 638 (1 Cir. 1958), with such other cases as NLRB v. Dan River Mills, Inc., 274 F.2d 381 (5 Cir. 1960); Edward Fields, Inc. v. NLRB, 325 F.2d 754, 760, 761 (2 Cir. 1963), and with the recent decision in Peoples Service Drug Stores, Inc. v. NLRB, 375 F.2d 551 (6 Cir. 1967). All of these point to invalidation of the Board's conclusion of lack of good faith doubt in this proceeding. Irving Air Chute Co. v. NLRB, 350 F.2d 176, 181–182 (2 Cir. 1965), and NLRB v. L. E. Farrell Co., 360 F.2d 205, 209 (2 Cir. 1966), are not to the contrary since in those cases there was no evidence of doubt of the union's majority; and NLRB v. Gotham Shoe Mfg. Co., 359 F.2d 684, 687 (2 Cir. 1966), upheld the Board's bargaining order on the ground, consistent with our discussion above, that "respondent has by its own conduct made the holding of a free election impossible." Remand for the Board to consider whether a bargaining order would be an appropriate remedy for the violations of § 8(a) (1) that we have recognized would be futile, since NLRB

v. Flomatic Corp., 347 F.2d 74 (2 Cir. 1965), would forbid enforcement of such an order if the Board were to make one.

Enforcement granted in part and denied in part.