Fred SNOW, Harold Snow and Tom Snow, d/b/a Snow & Sons, Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 17681.

United States Court of Appeals Ninth Circuit.

Sept. 28, 1962.

688

Halverson, Applegate, McDonald & Weeks, and C. W. Halverson, Yakima, Wash., for appellant.

Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Samuel M. Singer and James Paras,

Attys., N. L. R. B., Washington, D. C., Thomas P. Graham, Regional Director N. L. R. B., Seattle, Wash., for appellee.

Before ORR, HAMLEY and HAMLIN, Circuit Judges.

HAMLEY, Circuit Judge.

This matter is before us on a petition to review and set aside an order of the National Labor Relations Board, and upon the Board's cross-petition for enforcement of that order. The petitioners are Fred Snow, Harold Snow and Tom Snow, d/b/a Snow & Sons, vegetable packers of Outlook, Washington.

The complaint initiating the Board proceedings was based on charges filed by Fruit and Vegetable Packers and Warehousemen Union Local 760, affiliated with the International Brotherhood of Teamsters (Union). Specifically, the company was charged with refusing to bargain collectively with the union, and interfering with, restraining and coercing its employees in the exercise of their rights under section 7 of the National Labor Relations Act, as amended, 29 U.S.C.A. § 157. These asserted activities were alleged to constitute unfair labor practices within the meaning of sections 8(a) (1), (3) and (5) and sections 2 (6) and (7) of the Act, 29 U.S.C.A. §§ 158(a) (1), (3) and (5), and 152(6) and (7).

The company packs asparagus from April through June of each year, and sweet corn from July to September. On the evening of June 6, 1960, twelve company employees signed cards containing a declaration that the signer was applying for membership in the union and was authorizing the union to be his bargaining representative. Early on the morning of June 7, nineteen more employees signed such cards as they arrived at the

Snow parking lot to begin the day's work. The thirty-one employees who signed these cards constituted a majority of the forty-nine sorters, packers and other workmen then employed by the company.

About 9 A.M., June 7, 1960, after obtaining all of these applications, officials of the union called upon Fred, Harold and Tom Snow, at the company office, and asked the latter to enter into negotiations for a contract. One of the union officials stated that a majority of the crew were dissatisfied with conditions and had signed cards designating the union as their collective bargaining representative. The Snows expressed doubt that there was so much dissatisfaction and asked for an election supervised by the Board. Because of the time which this might require the union representatives demurred. There was then some discussion of the possibility of an expedited Board election, or an informal election.[1]

No agreement could be reached with regard to the holding of an election. An official of the union then suggested that a disinterested party check the signatures on the cards which the union held. This suggestion was accepted by the Snows and it was agreed that the check would be made by Rev. Arnold Pederson. At 11:30 A.M. on that day the union gave its signed cards to Rev. Pederson and Harold Snow delivered to him the signed W-2 income tax forms for each of its employees. The minister compared the two sets of signatures and a short time later reported in writing that of forty-nine employees, thirty-one were applicants for membership in the union.[2]

The parties then met from 1 to 3 P.M. that afternoon, at which time the union

---

1. The Snows made no claim that they needed more time in which to prepare for negotiations.

2. The written report of Rev. Pederson, copies of which were given to both Snow and the union, reads as follows:
   "I have counted the applicants for membership in the Fruit and Vegetable Packers and Warehousemen, Local Union 670 and have found thirty-one (31) applicants. According to the list of employees of Snow and Son there are forty-nine (49) employees.
   "Out of the 49 employees 18 have abstained from voting and 31 have voted in favor."

officials asked for immediate bargaining. The Snows refused to bargain, however, until it was first established by a Board-supervised election that the union represented a majority of their employees. While the union officials declared that an election was unnecessary in view of the card count, they expressed a willingness to have an immediate informal election. They would not, however, agree to a Board election because of the delay involved. An impasse having been reached, the union representatives departed. Shortly thereafter, on the afternoon of June 7, 1960, twelve employees walked out of the packing shed in protest against the company's refusal to bargain.

The union representatives, at their request, had another meeting with petitioners at 10 P.M. that night, the petitioners for the first time having their attorney in attendance. These conversations proved fruitless and the meeting broke up at midnight. On the morning of June 8, 1960, the union established a picket line with the twelve employees who had struck the previous day. Another seven employees refused to cross the picket line.

The strike continued until August 15, 1960, but the company continued operations. The union then notified petitioners that the strike had been terminated because the Board had decided to issue a complaint against Snow. Eleven strikers immediately made unconditional application for reinstatement.

The company offered to reinstate two strikers, Corrine Morrow and Alice Rowland, but refused to reinstate the other nine during the then-current corn season. Petitioners explained that these nine lacked experience as corn sorters and packers and could not be trained in mid-season. They were promised jobs in the asparagus season the following year. Morrow and Rowland, in protest against petitioners' refusal to reinstate the other nine strikers who had applied for reëmployment, declined to return to work.

At the hearing thereafter held before the Board's trial examiner, three issues were presented, namely: (1) did the union represent a majority of the employees on June 7, 1960?; (2) if the union represented a majority on that date, did the Snows nevertheless in good faith doubt the majority status of the union on that date?; (3) if the majority status of the union was established, and if the company did not in good faith doubt such status and wrongfully insisted on a Board election, were the striking employees who applied therefor entitled to reinstatement?

In his intermediate report and recommended order the trial examiner found with respect to the first of these issues that it had not been adequately established that the union actually represented a majority of Snow's employees. Concerning the second issue, the trial examiner found that assuming that the union did in fact represent a majority, the Snows nevertheless acted in good faith in refusing to negotiate with the union until this fact was established by a Board-supervised election.[3]

In view of these findings the trial examiner believed that it was not necessary for him to decide whether the striking employees were entitled to reinstatement, and he made no findings thereon. It was his conclusion that the company did not violate sections 8(a) (1), (3) or (5) of the Act.

Upon its review of the intermediate report and recommended order, the five-member Board, in its unanimous decision and order, reported at 134 N.L.R.B. No. 57, found contrary to the trial examiner's findings on the first two issues. It also found and concluded on the third issue, that Snow unlawfully refused to re-

---

3. The basis of this conclusion is not clearly indicated by the trial examiner's intermediate report and recommended order. The trial examiner may have concluded that the Snows genuinely doubted the union's majority status. On the other hand, he may have proceeded on the assumption that in the absence of a purpose to dissipate union strength, an employer may insist on a Board election even though he knows that the union represents a majority of his employees.

hire nine of the eleven strikers who had offered to return to work, and is obligated to rehire, upon application, the other two strikers who had applied for reinstatement.

Snow was ordered to cease and desist from discouraging membership in the union by refusing immediate reinstatement to the strikers upon their unconditional request. The company was also ordered to cease and desist from refusing to bargain collectively with the union as the exclusive representative of its employees. Affirmatively, the company was ordered to bargain collectively with the union upon request; to offer immediate reinstatement to the nine strikers who had applied for reëmployment and had been refused; to make them whole for any loss of pay they may have suffered because of such refusal; to reinstate, upon request, the two strikers the Snows had offered to reëmploy; and to post notices containing the usual recitals required by the Board as part of such a remedy.

In this court petitioners do not challenge the Board finding and conclusion that on June 7, 1960 the union actually represented a majority of the employees.[4] They do question the Board's findings and conclusions on the other two issues referred to above. We turn to the first of these—whether on June 7, 1960, Snow in good faith doubted the majority status of the union.

■ If petitioners in good faith doubted that the union represented a majority of their employees on that date, they were warranted in refusing to recognize the union until the claim was established by a Board election, even though the union in fact had majority status at that time. If, on the other hand, petitioners did not have a genuine doubt at that time concerning the union's majority status, but had some other reason for requiring a Board election as a prerequisite to collective bargaining, insistence upon a Board election was unwarranted and the refusal to bargain without first

having an election was an unfair labor practice. See N.L.R.B. v. Trimfit of California, Inc., 9 Cir., 211 F.2d 206, 209.

■ The issue under discussion thus turns upon a question of fact: Were the petitioners motivated by a good faith doubt as to the union's status in demanding a Board election before they would negotiate with the union? The findings of the Board with respect to this question of fact, if supported by substantial evidence on the record considered as a whole, are conclusive. Section 10(e) of the Act, 29 U.S.C.A. § 160(e). But unlike the rule which obtains on the review of the sufficiency of the evidence to support a jury verdict, the substantiality of the evidence in support of Board findings "must take into account whatever in the record fairly detracts from its weight." Universal Camera Corporation v. N.L.R.B., 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456.

■■ In reviewing the evidentiary support for the Board's findings as to petitioners' good faith we must also bear in mind that these findings were contrary to those reached by the trial examiner. The Board is not limited in its power to reverse an examiner's findings to cases in which the latter are "clearly erroneous." But the Supreme Court has admonished that evidence supporting a conclusion reached by the Board " * * * may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived with the case has drawn conclusions different from the Board's than when he has reached the same conclusion." Universal Camera, at pages 492, 496, 71 S.Ct. at pages 467, 468.

Giving effect to these guidelines to be followed in reviewing a Board finding of fact, we hold that the finding of the Board that the Snows entertained no reasonable doubt with respect to the union's representative status is supported by substantial evidence.

Perhaps as good a way as any to indicate why we have reached this conclusion

---

4. In the agency proceeding petitioners did question the majority status of the union.

is to discuss *seriatim*, the principal reasons advanced by petitioner why a contrary determination should be made.

First, it is argued in effect that the Snows did not know what was contained on the cards which the union held and, in any event, they were not informed prior to consenting to the signature check what would be the legal consequences of such a check. It is argued that the Snows did not consent to the check as determinative of union representation but, at most, as indicating whether there was substantial dissatisfaction among the employees regarding wages, hours and other working conditions.[5]

There is some testimony supporting the contention that the Snows did not know what was contained on the cards and that they considered the signature check only as a means of determining whether there was sufficient labor unrest to warrant a Board election. But there is also substantial testimony from one of the Snows, and from others, that the company agreed to the signature check to see if the union represented a majority. The Board was entitled to believe the latter testimony and to infer therefrom that the Snows regarded the cards as applications for union representation.

■ In any event, Rev. Pederson, who had been selected by the Snows as a neutral person to examine the signatures, informed them in writing that the cards were applications for union membership. It is immaterial that Rev. Pederson was not authorized to ascertain the character of the cards. The manner in which an employer receives reliable information of union representation, whether by accident or by design, or even while the employer is seeking to avoid receiving it, is of no consequence. Once he has received such information from a reliable source, insistence upon a Board election can no longer be defended on the ground of a genuine doubt as to majority representation.

Nor is it important whether an employer appreciates in advance that a card count may provide information which will undermine his right to insist on a Board election. Had the Snows been told in advance of the legal significance of the signature verification and had they then refused to participate in the signature verification procedure, they could no longer claim that their insistence on a Board election was in good faith. A different conclusion might be warranted if the Snows were then questioning the manner in which the signatures had been obtained by the union. But at the night meeting on June 7, 1960, their attorney assured the union representatives that the company had no feeling that the union had employed any illegal or coercive tactics in obtaining the signatures.

Next, it is argued that even after the signature count the union was amenable to an election, although only an informal one on short notice. Petitioners also point out that when the walkout occurred on the afternoon of June 7, 1960, only twelve participated in it, and that only seven more employees joined them the next morning—nineteen out of forty-nine employees. These facts, it is urged, provided additional reasons why petitioners could entertain a genuine doubt that the union represented a majority.

The fact that the union still indicated a willingness to submit to an informal election on short notice, after the signatures had been verified, is not evidence that the union did not rely on the card count.[6] While the union believed the card count conclusive, it was also interested in reaching an amicable settlement of the recognition issue. Willingness to submit to such an election represented a sincere effort in this direction, not a

---

5. In the agency hearing, but not in this court, petitioners took the further position that the signature check was not binding upon them because they had not agreed in advance to be bound thereby.

6. The union later withdrew its offer to submit to a quick, informal election.

concession that the company need not rely on the count.

The walkout occurred on short notice in the middle of the afternoon. The record indicates that union officials had little opportunity to contact employees at that time. The Snows were aware of this and in fact had taken steps to exclude union officials from the premises. What happened the next day with regard to the number joining the strike is immaterial, because the company had on the preceding evening expressed its final decision not to recognize the union. In any event, the number of employees who indicate a willingness to strike is not a reliable guide to the number represented by the union, at least when an actual count of signed union application cards is known.

Petitioners call attention to the fact that at the agency hearing, the attorney representing the Board's General Counsel disclaimed any charge that the Snows' insistence upon a Board election was motivated by a desire to undermine the majority status of the union. In this regard the case before us is to be distinguished from such cases as Joy Silk Mills v. N.L.R.B., 87 U.S.App.D.C. 360, 185 F.2d 732.[7]

Proof of an improper motivation for insisting upon a Board election warrants the inference that the employer, when it refused to recognize the union, did not have a reasonable doubt as to the union's majority status. But proof of such motivation is not essential in order to make such a finding if lack of a reasonable doubt is established in some other way.

Here there was substantial evidence that, before their final decision on the night of June 7, 1960, that they would not recognize the union, the Snows had no reasonable doubt that the union had majority status. What their motivation may have been for refusing to recognize the union after reasonable doubts had been dispelled is immaterial.

Petitioners point out that there is testimony in the record reflecting upon the manner in which the union obtained the signatures of the employees and the purposes for which they were obtained. This testimony was given by two employees. One of them, Kathleen Rose Peterson, testified that she was advised by one of the union organizers that by signing a card an employee did not necessarily choose the union as a bargaining representative at that time, but merely indicated that the union would have his backing if an election were held.[8]

The other employee, Ruth Clift, testified that when she was handed a card to sign she noted that it was an application for membership. She told a union official that she did not want to join, but signed the card when this official told her that signing the card was just more or less a formality and that an election would be held to find out whether the employee wanted the union to "come into the shed." [9]

7. The attorney for the General Counsel, after making this statement, told the trial examiner:
   "In that extent, I think, Mr. Examiner, the case is somewhat novel. In almost all the cases that I have [187] been able to find evolved around the issue that the respondent was insisting on the Board election in order to gain time to undermine the majority status of the union."

8. This witness further testified:
   " * * * I was told more than once I would have a right to make up my own mind which way to vote at the election and each time I was told that someone was telling me that I should vote for the union and then they'd say, 'It's all right

for you to make up your own mind.' But if I asked any questions about it they'd get mad and tell me why I should vote for the union when they had an election."

9. It was because the trial examiner credited the testimony of these two witnesses that he held that the process followed by the union in obtaining applications was so "tainted" that the union had not been established as representing a majority. The Board disagreed, holding that while this testimony would warrant disregard of the application cards of those two employees, it did not justify a finding that the other twenty-nine application cards were wrongfully obtained. As stated earlier in this opinion, peti-

The Snows did not know of these employee experiences in signing the cards until the agency hearing was held several months later. At the time they were refusing to recognize the union they were not aware of any employee dissatisfaction with the way the signatures were obtained. No employee other than Kathleen Rose Peterson had made known to the Snows, prior to the strike of June 8, 1960, his or her regret in having signed a card. Miss Peterson told Mrs. Snow on the morning of June 7, that she wished she had not signed the union card because of the trouble that was being caused. She did not at that time, however, make any complaint concerning the manner in which her signature had been solicited.[10]

■ The fact as to whether an employer entertained a genuine doubt that a union represents a majority of the employees is to be determined as of the time the employer refused to recognize the union. Once it is shown that the employer entertained no genuine doubt of this kind at the time it refused to bargain, an unfair labor practice has been established. The fact that, as it later developed, there were grounds which might have created a genuine doubt at that time is then immaterial.

■ The remaining factors relied upon by petitioners in asking us to overturn the Board finding under discussion have been considered but, in our view, considered separately or together with the other contentions discussed above, they do not warrant such action on our

part. We conclude that the Board finding that when the Snows declined to recognize and bargain with the union they entertained no reasonable doubt with respect to the union's majority status is supported by substantial evidence on the record considered as a whole.

■ As before indicated, petitioners also question the Board finding that the company unlawfully refused to rehire nine of the eleven strikers who had offered to return to work. The Board's finding to this effect is based on alternative grounds, namely: (1) since petitioners' refusal to bargain, which brought about the strike, was unlawful, the strike was an unfair labor practice strike and, in these circumstances, strikers who unconditionally apply for reinstatement are entitled thereto even if employees hired during the course of the strike must be fired;[11] and (2) even if the strike was an economic, rather than an unfair labor practice, strike, the employees who applied for reinstatement were entitled thereto if, after the termination of the strike, jobs for which they are qualified are available, and under the facts of this case jobs were available for which these applicants were qualified.[12]

Since we have upheld the Board determination that this was an unfair labor practice strike, it is only necessary to determine whether, as provided under the first of these alternative principles, the nine employees who applied for reinstatement were qualified for jobs then available or which could have been made available by discharging employees hired during the course of the strike.

tioners do not question that Board ruling on this review.

10. As previously noted, at the night meeting on June 7, 1960, the attorney representing the Snows had assured the union representatives that the company had no feeling that illegal or coercive tactics had been used in obtaining signatures.

11. See N. L. R. B. v. Mastro Plastics Corp., 350 U.S. 270, 278, 76 S.Ct. 349, 100 L.Ed. 309; N. L. R. B. v. Giustina Bros. Lumber Co., 9 Cir., 253 F.2d 371, 374; N. L. R. B. v. West Coast Casket Co., 9 Cir., 205 F.2d 902, 908. Where this rule is applicable, strikers who are offered reemployment, but withhold their service in protest over the employer's refusal to reemploy their co-workers, must also be reinstated upon application. N. L. R. B. v. New England Tank Truck Industries, Inc., 1 Cir., 302 F.2d 273.

12. See N. L. R. B. v. Buzza-Cardozo, 9 Cir., 205 F.2d 889, 890; N. L. R. B. v. Globe Wireless, Ltd., 9 Cir., 193 F.2d 748, 750.

At the agency hearing, petitioners contended that these nine employees were not qualified for any such jobs. It was pointed out that asparagus packing was in progress when the strike commenced in June, 1960, and that only corn packing was in progress when the nine strikers applied for reinstatement in the middle of August of that year. None of these employees had any experience in corn packing which was then at its height.

The Board rejected this contention, pointing out that eight employees who, like the nine referred to above, had no prior experience in corn packing, were hired and trained by petitioners after the strikers were denied jobs in corn. It appears to us that the reason given by the Board adequately meets the contention that the nine who sought reinstatement were inexperienced and could not be trained in the middle of the season.

Petitioners point out that there is no showing that these nine were in fact, available for employment at the company plant in September, 1960 when the eight inexperienced new employees were hired. However, it was petitioners' obligation to ascertain whether the nine were available before employing others. Apparently no such inquiry was made.

The burden of establishing that no jobs were available rested upon petitioners, for the matter is one within their peculiar knowledge. N. L. R. B. v. Cambria Clay Products Co., 6 Cir., 215 F.2d 48, 56. They did not sustain this burden and consequently the Board finding is amply supported by the record.

The Board order is affirmed and a form of decree may be presented calling for its enforcement.