**TRUCK DRIVERS UNION LOCAL NO. 413 etc. et al., Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD.**

**TEXTILE WORKERS UNION, Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondents.**

**Nos. 71–1529, 72–1794.**

United States Court of Appeals, District of Columbia Circuit.

Argued March 8, 1973.

Decided Sept. 13, 1973.

Laurence Gold, Washington, D. C., for petitioners. Sidney Dickstein, Washington, D. C., and Thomas F. Phalen, Jr., Dayton, Ohio, were on the brief for petitioner in No. 71–1529.

Patricia Eames, New York City, J. Albert Woll and Thomas E. Harris, Wash-

ington, D. C., were on the brief for petitioner in No. 72–1794.

Stanley R. Zirkin, Atty., National Labor Relations Board with whom Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., at the time the brief was filed, and Robert A. Giannasi, Atty. N. L. R. B., were on the brief, for respondent.

Before LEVENTHAL and ROBB, Circuit Judges and JAMESON,* Senior United States District Judge for the District of Montana.

LEVENTHAL, Circuit Judge:

These consolidated appeals raise the question of the scope of an employer's duty to bargain, under Section 8(a)(5) of the National Labor Relations Act, on the basis of authorization cards obtained by the union, in light of NLRB v. Gissel Packing Co., 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The cases require review of two orders of the National Labor Relations Board. The factual settings are closely related. We shall set out the background in each case before considering the pertinent legal principles.[1]

## I. STATEMENT OF FACTS AND PROCEDURAL HISTORY

### A. *Wilder Manufacturing Co.*

On the morning of October 12, 1965, representatives of the Textile Workers presented Walter Derse, secretary and general manager of Wilder, with 11 signed and two unsigned union membership cards[2] and requested recognition as

---

* Sitting by designation pursuant to 28 U.S. C. § 294(d).

1. No. 71–1529 is before the court on petition of Truck Drivers Union Local No. 413 (Truck Drivers) affiliated with International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, to set aside a Board decision refusing to order Linden Lumber Division, Summer & Co., ("Linden") to bargain with the union, 190 NLRB No. 116, June 7, 1971.

No. 72–1794 is before the court on petition of Textile Workers Union of America to review the Board's Second Supplemental Deci-

sion and Order, refusing to issue a bargaining order directed against Wilder Manufacturing Co., August 21, 1972, reported at 198 NLRB No. 123.

All parties agree that the Board's finding of facts are supported by substantial evidence. Accordingly, we rely for our statement of facts on the decisions of the Board, 173 NLRB No. 30 (1968), 185 NLRB No. 76 (1970), (Wilder); 190 NLRB No. 116 (Linden Lumber Division, Summer & Co.), and the trial examiner's decisions as adopted.

2. The cards were signed at the home of William Hissam, a representative of the Union,

bargaining agent of the Company's production and maintenance employees. Of the 30 employees then on the Company's payroll, 18 were in the production and maintenance unit, which the Board found to be appropriate for purposes of collective bargaining.[3] Failing to receive an immediate answer to the request, the eleven employees who had signed the authorization cards left the plant and established a picket line. They were joined the next day by the two employees whose blank cards were among the thirteen presented to Derse.[4]

During the evening of the next day, October 13, the Company's officers met. Walter Derse reported that there were ten or eleven employees on the picket line .and as "we are about 30 (not including the officers of the Company) it appears that they do not represent a ma-

jority." The officers decided not to recognize the union.[5] The picketing continued for at least five months thereafter. Subsequent demands for recognition were made without response. from the Company.

On May 9, 1966, the Board's General Counsel filed a complaint charging Wilder with violations of § 8(a)(1) and (5) of the Act.[6] The Trial Examiner, on September 22, 1966, upheld the complaint on the § 8(a)(5) and dismissed the 8(a)(1) charge.[7] The Board, however, concluded that the 8(a)(5) charge should be dismissed since "there is no showing whatsoever that Respondent had rejected the collective-bargaining principle or engaged in any interference, restraint, or coercion of employees to undermine the Union. Nor does the record show that Respondent has en-

---

on the evening of October 11. The card contained the following language:

"I hereby accept membership in the Textile Workers Union of America of my own free will and do hereby designate said [Union] as my representative for the purposes of collective bargaining in respect to rates of pay, wages, hours of employment, and other conditions of employment." (JA at 11.)

3. In the amended complaint, the General Counsel alleged that. the appropriate unit for the purposes of collective bargaining within the meaning of Section 9(b) of the Act is "All production and maintenance employees of Respondents, employed at its Port Jarvis plant, exclusive of draftsmen, office clericals, plant clericals, guards, watchmen, professional employees and all supervisors as defined in Section 2(11) of the Act." (JA at 12.)

By consent of all parties 18 employees were included in a unit of production and maintenance employees. The General Counsel and the company disagreed as to whether seven additional employees should be included in that unit. The Trial Examiner found that two of the contested employees were supervisors, and that the other five employees lacked "a community interest" with the production and maintenance employees. (JA at 12–17).

4. As the Trial Examiner noted, as the company's proposed unit was 25 employees, "it is apparent that the Union on October 12, 1965, held valid authorization cards (13 in

number) for the majority of the employees in such unit."

5. As reported by the Trial Examiner, Derse included all the employees in the thirty

"because . . . what Mr. Cohen [a union representative] told me was that they represented a majority of our employees." . . . [T]he Trial Examiner has found that the Union requested representation in a production and maintenance unit thus there was no basis for Derse's assertion that the Union desired to .represent all thirty employees. Moreover, the Trial Examiner is not convinced that Derse was so unschooled in labor matters as to believe that the Union was seeking to represent Plant Manager Mr. Carlin, Supervisor DeGraw, or the office clerical employees whom the employer conceded should be .excluded from the appropriate unit. Furthermore at the time Derse's remarks were claimed to have been made, he was aware that only production and maintenance employees had joined the strike. (JA at 19 n. 35).

6. As to the 8(a)(1) charge, the complaint alleged that certain statements by a supervisor violated the § 7 rights of Wilder employees. This unfair labor practice charge is not before the court.

7. The designation of the valid 8(a)(1) charge was only in connection with the. failure to bargain under 8(a)(5), thus not constituting an independent unfair labor practice.

gaged in any other conduct which would prevent the holding of a fair election." [8] On petition for review to this court, we held per curiam, 137 U.S.App.D.C. 67, 420 F.2d 635 (Nov. 14, 1969), that in light of the intervening *Gissel* decision, *supra,* and possible conflicts between the "current practice" of the Board, as represented to the Supreme Court, and the decision reached, the case should be remanded for "further consideration by the Board in the first instance in light of *Gissel,* but without limitation." [9]

On August 27, 1970, 185 NLRB 175, the Board issued a Supplemental Decision and Order, after a review of the entire record, and now found that Wilder's course of conduct did constitute a violation of § 8(a)(5). In reaching this result the Board declined to rest on a finding that the case presented an employer who refused to bargain and "stands upon his doubt as to the appropriateness of the unit," stating that "the Respondents' response—or lack of response—to the Union demand did not assert this as the ground of the refusal . . . ."[10] Instead the Board focused on these findings: (1) There was evidence, in addition to mere cards, sufficient to communicate to the employer convincing knowledge of majority status (the independent knowledge test). (2) The evidence was insufficient to show that the employer's refusal to grant recognition was based upon genuine willingness to resolve any doubts concerning majority status through the Board's election process. On finding both these conditions met, the Board concluded that the refusal to bargain constituted a violation of 8(a)(5).[11] The Board then filed an ap-

8. In so holding the Board acknowledged that proof of "bad faith" would be a basis of a valid 8(a)(5) violation, but equated this with evidence that the "Employer has completely rejected the collective-bargaining principle or seeks to gain time within which to unlawfully undermine the Union and dissipate its majority." (JA at 6).

9. 137 U.S.App.D.C. at 68, 420 F.2d at 636. The court noted specifically that the defense advanced by the employer, that it did not think the cards presented to it represented a majority of the appropriate unit, seemed inconsistent with the Board's position in *Gissel,* where the Board represented to the Court at oral argument that "an employer could not refuse recognition initially because of questions as to the appropriateness of the unit." 395 U.S. at 594, 89 S.Ct. at 1930. Judge Fahy, concurring separately in the per curiam, stated (137 U.S.App.D.C. at 70, 420 F.2d at 638):

The present record reveals that the Union representatives had authorization cards free of suspicion from a majority in a unit recognized as appropriate by the trial examiner and the Board, followed by evidence of the majority's solidarity through the picketing and strike. Moreover, the employer did not demand that the Union request a Board election.

10. The Board, in note 4 of its supplemental decision, stated:
"The Respondents did later contend before this Board that certain additional employees should be added to the Union's proposed unit. We have, however, in other cases been required to resolve such unit questions in 8(a)(5) cases and, upon making a finding of appropriate unit, then proceeded to direct the respondent to bargain in the unit ultimately found appropriate . . . . Generally, of course, any such doubts are best resolved in the course of representation case procedures which any party is free to invoke. As we note *infra,* the Respondents here made no attempt to resolve any doubts as to appropriateness of unit by this method." (JA 34).

11. The Board attributed "independent knowledge" to the employer on the basis of (a) 11 of 18 production and maintenance employees had signed cards, (b) all of the card signers went on strike, and (c) "an officer of the Respondent conceded in his testimony that he told his fellow officers that the Union 'had 10 or 11' of the employees." (JA at 35.)
As to the second condition, the Board noted that "the Employer did not itself file an election petition or urge or even suggest to the employees or the Union the use of such procedures." (JA at 35) Also the Board rejected Respondent's contention that the provisions of 8(b)(7)(C) supported its position that an election was required because picketing for recognition is unlawful if "conducted without a petition under Section 9(c) being filed within a reasonable period of time not to exceed thirty days from the commencement of such picketing." The Board relied on Blinne Construction Company, 135 NLRB 1153 (1962) as rejecting that construction of the statute where a un-

plication for enforcement of its supplemental order in this court on September 21, 1970. While the petition was pending, the Company moved to dismiss this petition on jurisdictional grounds, and subsequently the Board moved to have the case remanded to it for reconsideration in light of its decision in Linden Lumber, 190 NLRB No. 116, 77 LRRM 1305 which issued on June 7, 1971 and is the companion case in this litigation. Our court upheld the jurisdictional objections of the company and transferred the case to the Second Circuit,[12] which on February 1, 1972, remanded to the Board for the requested reconsideration.[13]

The Board on August 21, 1972, 198 NLRB No. 123, then issued its Second Supplemental Decision and Order in *Wilder* which reversed the First Supplemental Decision and Order. The Board, one member dissenting, rejected the "independent knowledge" test and held that absent voluntary measures by the employer, through an attempt [14] or agreement [15] to determine majority status by any means other than a Board election, and in the absence of any independent unfair labor practices, the pred-

icate could not be established for an 8(a)(5) violation.[16] After over 7 years, and three Board decisions representing a series of reversals in position, the Board now seeks to limit sharply the scope of any duty to bargain on the basis of authorization cards.

### B. *Linden Lumber*

The procedural history of *Linden Lumber* is shorter—there is only one Board decision—but pointed, for it is on the basis of the Board's decision in this case, issued June 7, 1971, that the decision in *Wilder* rests. The time elapsed since the underlying events, however, is more than six years.

On December 28, 1966, employee Martin contacted Local 413 representative Dow Norman about organizing the employees of Linden Lumber (the Company). Next day, Norman held a meeting during which 12 employees, including 2 alleged supervisors, Shafer and Marsh, signed authorization cards. In the proceeding before the Trial Examiner, "the parties stipulated that at all times material there were 10 employees" within the appropriate bargaining unit.[17] On Jan-

---

ion strikes and pickets against an employer's unlawful refusal to recognize it and meritorious 8(a)(5) charges have been filed. (JA 37).

12. 147 U.S.App.D.C. 152, 454 F.2d 995 (1971).

13. JA at 104.

14. Citing National-wide Plastics, 197 NLRB No. 136 (1972).

15. Citing Snow & Sons, 134 NLRB 709, enf'd 308 F.2d 687 (9th Cir. 1962).

16. The Board was of the view that no workable standard could be developed to evaluate whether an employer "knows" or "doubts" majority status, nor would it determine the "willingness" of the employer to have majority status determined by the election process. Moreover, the Board emphasized the "preferred status" of the election process. It concluded:

> We think it far better, by making clear here, as we did in *Linden*, that the proper course in such cases is for the union, on behalf of the employees, to invoke our election processes. In that manner, if

there is indeed majority support, it will be evidenced in clear and unmistakable fashion within a matter of a few weeks. Surely this is a far better basis for the bargaining relationship than a decision in litigation which would take us nearly a year to reach and which, even then, may be subject to debate as to the soundness of its evidentiary base and to further contest in the courts. (JA at 110).

17. There was agreement that the following unit was appropriate within the meaning of Section 9(b) of the Act:

> All truck drivers, warehousemen, production and maintenance employees and yardmen . . . excluding office clerical employees, guards and supervisors. (JA at 73)

Initially there was a dispute over the inclusion of three alleged supervisors in the unit, but the parties agreed that one, a Mr. Toops, was a supervisor. As to Marsh, the trial examiner found he was not a supervisor. Since Shafer resigned on February 6, 1965, the Trial Examiner determined it was unnecessary to decide whether he was, in fact, a supervisor. (JA at 73–74)

uary 5, 1967, Local 413 ("the Union") sent a letter to the Company requesting recognition. On February 3, at a pre-hearing conference on the Local's representation petition, the Company declined the Union's request to enter into a consent election agreement. Instead the Company raised threshold questions as to the Union's showing of interest, on the basis that the union had been organized by supervisors (Marsh and Shafer).[18] Based upon the Company's alleged fear of recognizing a supervisor—dominated union, the Company stated that unless it could settle the 8(a)(2) violation in the context of the petition for an election—a request refused by the hearing officer—it would refuse to recognize the union, even after a Board—conducted election.[19] Immediately after this statement by the representative of the Company (Mr. Rector), the Union's representatives withdrew the representation petition.[20] After the withdrawal was approved, Rector told Mr. Smedstad, the Union attorney, that if the Union submitted a new petition supported by a "fresh" 30 percent showing of interest, the company would go to a consent election. By March 4, the Union had obtained 9 signatures (leaving out the two alleged supervisors, Shafer and Marsh). The Company still refused to recognize the Union "because its membership included supervisors who influ-

enced employees," again raising the spectre of the 8(a)(2) violation.

On February 15, the employees struck in support of the Union demand for recognition.[21] The Union filed its charge of refusal to bargain on February 23, and the strike ended on June 1. At the end of the strike the Company refused to reinstate Marsh and another striker, Alexander. Marsh was refused reinstatement on the ground that he had quit. Alexander was refused on the strength of the Company's belief that he had provoked and participated in a violent incident related to the picketing at the plant.

On these facts, the Trial Examiner concluded that the Company violated Section 8(a)(5) by refusing to recognize the Union, that the strike was an unfair labor practice strike, and that Marsh and Alexander were unlawfully denied reinstatement in violation of Section 8(a)(3).

The Board concluded that Marsh and Alexander, as economic strikers, were wrongfully denied reinstatement in violation of Section 8(a)(3). It further determined, two members dissenting, to reject the Examiner's conclusion, and held that the Company did not violate § 8(a)(5) and (1) of the Act by refusing to bargain with the Union.

The Board majority began its analysis by noting that the § 8(a)(3) violation

---

Thus, the Examiner determined there were 11 legitimate employees in the actual unit. Eliminating the vote of Shafer, every member of the appropriate unit signed an authorization card.

18. The employer had reference to a possible 8(a)(2) violation which prescribes employer domination of unions.

19. The Hearing Officer ruled that Linden's claim of supervisory influence in organization of Local 413 related to the Union's administrative showing of interest (Board Rule 101.18) and could not be litigated at a representation hearing. (See JA at 46.)

The Trial Examiner subsequently found, in the hearing on the 8(a)(5) charge, that in fact there were no supervisors in the bargaining unit.

20. The Trial Examiner found, on the basis of cross-examination of the union's counsel, that this was done to avoid two years of litigation. The sequence, of course, would be the order of an election; if the union wins, the employer resists recognition; the General Counsel brings an 8(a)(5) violation. The union sought to short-circuit this proceeding by moving directly to an 8(a)(5) proceeding, a strategy facilitated by the complaint of the General Counsel. Obviously the union attorney did not anticipate, nor could he, that the question of recognition would still be unsettled in 1973.

21. Initially, Marsh did not join the strike on union instructions because his status as a supervisor was in question. On February 27, Marsh ceased work, apparently joining the strikers.

did not amount to a serious independent unfair labor practice, and that it could not make a finding that "the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order . . . ." (*Gissel, supra*, 395 U.S. at 614–615, 89 S.Ct. at 1940). This conclusion is not challenged in this petition for review.

Noting that *Gissel* left open "whether, absent election interference, an employer who insists on an election must initiate the election by his own petition," the Board reviewed the "current practice" on this question alluded to in *Gissel*.[22] The Board then questioned whether the Supreme Court summary "is entirely accurate," particulary whether the Board had ever used the "independent knowledge" test as a basis for a bargaining order. It stated that Snow & Sons, 134 NLRB 709, enf'd, 308 F.2d 687 (9th Cir. 1962) did not rest only on the fact of employer *knowledge*, but "also upon the fact that the employer breached his agreement to permit majority status to be determined by means other than a Board election." The Board also distinguished its decision in *Wilder*,[23] observing "[t]here we found an 8(a)(5) violation not only because of admitted employer knowledge of majority status, but also because of the absence of any evidence that the employer was willing to

resolve any lingering doubts of majority status through our election procedures." The Board then argued that the "independent knowledge" test was unworkable, and also questioned how it could determine the "willingness" to have majority status determined by an election. The Board stated, "how are we to judge 'willingness' if the record is silent, as in *Wilder*, or doubtful, as here, as to just how 'willing' the Respondent is in fact? We decline, in summary to re-enter the 'good faith' thicket of *Joy Silk* . . . ."[24] The Board indicated that it intended to restrict the scope of § 8(a)(5) to those situations in which the company and union had "voluntarily" agreed "upon [a] mutually acceptable and legally permissible means, other than a Board-conducted election, for resolving the issue of union majority status."

## C. Contentions of the Parties

The petitioner unions contend that the language and history of §§ 8(a)(5) and 9(a), and subsequent court decisions, establish that an employer has a duty to bargain whenever the union representative presents "convincing evidence of majority support," that this requires an evaluation of whether "a reasonable man" would consider any particular evidence convincing, and that such convincing evidence was supplied in the instant cases by the recognitional strikes, joined by a majority of their employees. They submit that retention of an independent knowledge test is not inherently unworkable, at least when knowledge is deter-

---

22. The Court stated, 395 U.S. at 594, 89 S. Ct. at 1930:
    Under the Board's current practice, an employer's good faith doubt is largely irrelevant, and the key to the issuance of a bargaining order is the commission of serious unfair labor practices that interfere with the election process and tend to preclude the holding of a fair election. Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; he need give no affirmative reasons for rejecting a recognition request, and he can demand an election with a simple 'no comment' to the

union. The Board pointed out, however, (1) that an employer could not refuse to bargain if he *knew*, through a personal poll for instance, that a majority of his employees supported the union, and (2) that an employer could not refuse recognition initially because of questions as to the appropriateness of the unit and then later claim, as an afterthought, that he doubted the union's strength.

23. At this time, the second Board decision, finding an 8(a)(5) violation, was in effect.

24. Joy Silk Mills, Inc., 85 NLRB 1263, enf'd as modified, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950).

mined on the basis of a recognitional strike.

The Board, on the other hand, has adopted a "voluntarist" view of the duty to bargain. Absent unfair labor practices or an agreement to determine majority status through means other than an election, such as a poll, the employer has no duty to recognize the union. This means, in effect, that as a matter of law, the decision to recognize a union on the basis of cards is entirely within the control of the employer; neither "bad faith" or "independent knowledge" can lay the predicate for recognition because those concepts are deemed unworkable.

## II. THE STATUTORY FRAMEWORK

While there is certainly wide latitude for Board policy in interpreting the requirements of statutory obligations, "The policy of Congress . . . cannot be defeated by the Board's policy," Machinists Local 1424, 362 U.S. 411, 429, 80 S.Ct. 822, 833, 4 L.Ed.2d 832 (1960). We therefore begin with a brief examination of the legislative materials.

Section 9(a) provides that: "Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees . . . . . " Section 8(a)(5) then provides that it shall be an unfair labor practice for an employer "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 9(a)." *Gissel*, aside from its specific holdings,[25] is important in recognizing that:[26]

> Since § 9(a) . . . refers to the representative as the one "designated or selected" by a majority of

the employees without specifying precisely how that representative is to be chosen, it was early recognized that an employer had a duty to bargain whenever the union representative presented "convincing evidence of majority support."

The view that an election was not the only predicate for a union claim to majority status is given added emphasis by the Conference Committee rejection of that proposal when the basic Act was under revision in 1947. The House version of § 8(a)(5) would have made a refusal to bargain an unfair labor practice only if the union were already certified under § 9(a). This was rejected in favor of the broader Senate version.[27] The language was not changed as the House proposed, even though, as *Gissel* points out, it had been early recognized, by interpretation of the outstanding law, that the employer had a duty to bargain whenever the union representative presented convincing evidence of majority support.

What Congress did do in 1947 was to add a provision, in § 9(c)(1)(B), to give employers the right to file their own representation petitions. It provides:

> Whenever a petition shall have been filed, in accordance with such regulations as may be prescribed by the Board— . . . .
>
> > (B) by an employer, alleging that one or more individuals or labor organizations have presented to him a claim to be recognized as the representative defined in section 9(a);
>
> the Board shall investigate such petition and if it has reasonable cause to believe that a question of representation affecting commerce exists shall provide for an appropriate hearing upon due notice.

25. The Supreme Court left open the issue presented in the instant cases, 395 U.S. at 595 and 601 n.18, 89 S.Ct. 1918.

26. 395 U.S. at 596, 89 S.Ct. at 1931.

27. *See* H.R. 3020, 80th Cong., 1st Sess. (1947) (House Bill). The Conference Report, H.R.Rep.No.510, 80th Cong., 1st Sess.

41 (1947) stated: "The conference agreement . . . follows the provisions of existing law . . . in the case of section 8(5) . . . which makes it an unfair labor practice for an employer to refuse to bargain collectively with the representative of his employees, subject to the provisions of section 9(a)."

These statutory provisions plainly contemplate employer duty of recognition even in the absence of election, and give a safeguard to the employer who has doubts about majority status by assuring him the right to file his own petition for an election. There is no clear cut answer, however, either in the text of the statute or the legislative history, to the question of when and in what circumstances an employer must take evidence of majority support as "convincing." That is the focal issue of these cases.

## III. STANDARDS FOR CARD RECOGNITION

In approaching the question of a possible standard for card recognition, we must begin by recognizing that "cards are not the functional equivalent of a certification election," [28] and elections have a "preferred status" as a means of determining representation.[29] Three reasons are primary in the Board's conclusion that cards do not have the same standing as certification election. (1) There is greater opportunity for coercion of employees by union organizers, as compared with a secret ballot.[30] (2) Arguably, employees may misunderstand the import of signing an authorization card, because of misreading, failure to read, or union misrepresentation.[31] (3) When cards are used, the employer has no opportunity to speak to his employees concerning their determination to have union representation, and an employer's right to communicate to employees concerning representation is arguably guaranteed under § 8(c) of the Taft-Hartley Act.[32] Out of these considerations arises an inhibition on the part of the Board to expand the mandatory scope of a duty to bargain on the basis of cards.

### A. The Independent Knowledge Standard

Prior to the present litigation, the Board implemented the policy favoring elections over cards by adopting a limited scope for a duty to bargain in the absence of election. The rule adopted by the Board has been described as the "independent knowledge" standard.[33]

This rule developed from the case of *Snow & Sons* [34] where the employer, upon being presented with an apparent card majority, at first refused to recognize the union and insisted that it petition for an election. Subsequently, the employer agreed to submit the cards to an impartial third party, but after authentication, the employer refused recognition claiming he never considered the agreement binding. The Board held that, given the authentication, the refusal to bargain was not based on a reasonable doubt as to the union's majority. During the 1960's the *Snow & Sons* doctrine was applied where an employer had reneged on an agreement to have the cards authenticated by an impartial par-

---

28. Comment, Employer Recognition of Unions on the Basis of Authorization Cards: the "Independent Knowledge" Standard, 39 U.Chi.L.Rev. 314, 318 (1972).

29. The Court in *Gissel* noted that "secret elections are generally the most satisfactory —indeed the preferred—method of ascertaining whether a union has majority support." 395 U.S. at 602, 89 S.Ct. at 1934.

30. Comment, Refusal-to-Recognize Charges Under Section 8(a)(5) of the NLRA: Card Checks and Employee Free Choice, 33 U. Chi.L.Rev. 387, 390 (1966). While this argument certainly has force on its face, its force is presumably subject to discount for the ability of union organizers to effectively influence votes in election campaigns.

31. *See* Note, Union Authorization Cards, 75 Yale L.J. 805, 823; Cf. Lesnick, Establishment of Bargaining Rights Without an NLRB Election, 65 Mich.L.Rev. 851 (1967).

32. Courts have protected the employer's right to influence the vote of his employees through non-coercive speech. *see* Thomas v. Collins, 323 U.S. 516, 537–538, 65 S.Ct. 315, 89 L.Ed. 430 (1945); NLRB v. Virginia Elec. & Power Co., 314 U.S. 469, 62 S. Ct. 344, 86 L.Ed. 348 (1941); Surprenant Mfg. Co. v. NLRB, 341 F.2d 756 (6th Cir. 1965).

33. Comment, note 28 *supra*, at 319.

34. 134 NLRB 709 (1961), enforced, 308 F. 2d 687 (9th Cir. 1962).

ty and to be bound by such *authentication*.[35]

We interject to note that at this time —prior to *Gissel* in 1969—the applicable doctrine defined an employer's right of non-recognition as applicable only in case of a "good faith doubt as to the unions' majority status." *Joy Silk Mills, Inc. v. NLRB*, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950); *Retail Clerks Union, Local No. 1179 v. NLRB*, 376 F.2d 186 (9th Cir. 1967). In *Gissel*, the Board announced "at oral argument that it had virtually abandoned the *Joy Silk* doctrine altogether."[36] The Court further stated the Board's position at that time (395 U.S. at 594, 89 S.Ct. at 1930):

> Thus, an employer can insist that a union go to an election, regardless of his subjective motivation, so long as he is not guilty of misconduct; he need give no affirmative reasons for rejecting a recognition request, and he can demand an election with a simple "no comment" to the union. The Board pointed out, however, (1) that an employer could not refuse to bargain if he *knew*, through a personal poll for instance, that a majority of his employees supported the union, and (2) that an employer could not refuse recognition because of questions as to the appropriateness of the unit and then later claim, as an afterthought, that he doubted the union's strength.

Subsequent to *Gissel*, two Board decisions expanded on the *Snow* rationale.

In *Pacific Abrasive*,[37] presentation of the card majority was accompanied by the employer's verification of the signature on the cards, an acknowledgement of authenticity, conversations with employees who indicated union support, and a strike in support of recognition by a majority of the unit. The Board was thus relying on conduct of the employer or employees, in drawing the inference that the employer must have known that the union had a majority.[38] *Pacific Abrasive* was followed by the second decision in the instant case, *Wilder*, where the Board established "independent knowledge" on the basis of evidence in addition to mere cards, sufficient to communicate to the employer "convincing" knowledge of majority status.[39] In the Board opinions now before us for review, the Board has retreated to the facts of *Snow & Sons*, the fact of an agreement to be bound by an independent authentication, as offering the only valid basis for an employer duty to bargain on the basis of "independent knowledge." Thus, "[u]nless, as in *Snow & Sons*, the employer has agreed to let its 'knowledge' of majority status be established through a means other than a Board election" (JA at 53–54) the facts will not justify an 8(a)(5) bargaining order.

It is important to understand, however, that it was represented to the Supreme Court in *Gissel* that the facts of *Snow & Son* laid the predicate for a finding of independent knowledge, not

---

35. Lesnick, *supra* note 31, at 852.

36. The "good faith" doubt test of *Joy Silk* had been widely criticized as plunging the Board and courts into a search for subjective intent. *See* Christensen & Christensen, Gissel Packing and "Good Faith Doubt": The Gestalt of Required Recognition of Unions Under the NLRA, 37 U.Chi.L.Rev. 411 (1970). It is one thing to abandon a subjective standard used to determine when employers are required to recognize on the basis of cards and replace it by the alternative, and arguably more objective, standard of "independent knowledge". That was the Supreme Court's understanding in *Gessel*. It is another thing to abandon any standard.

37. 182 NLRB 329, 74 LRRM 113 (1970).

38. Comment, *supra*, note 28, at 321.

39. The Board relied on the following facts in finding "independent knowledge":

> In the instant case, the record demonstrates not only that 11 out of 18 production and maintenance employees had signed authorization cards, but also that all of the card signers dramatically evidenced their support for the Union by actively participating in a picket line and in a strike, and furthermore, that an officer of the Respondent conceded in his testimony that he told his fellow officers that the Union "had 10 or 11" of his employees.

that a finding of "independent knowledge" was restricted to such facts.[40] The Board in its decision questions whether the Supreme Court accurately summarized its position.[41] This is not just a matter of historical detail; inherent in the two positions is a difference which goes to the heart of the Congressional policy established by the statute.

■ The abandonment of *Wilder II* means that even if an employer acts in total disregard of "convincing evidence of majority status," he has no duty to recognize a union. That duty can only be triggered by his own permission, in allowing an impartial party to assess union strength.

There were a number of indices in both *Wilder* and *Linden Lumber,* which could have laid the predicate for "convincing evidence of majority status"; in *Wilder,* there was a strike in support of the cards, and an admission of Respondent that the Union had "10 or 11" of his employees; in *Linden Lumber,* there was a recognitional strike, and a renege on the employer's agreement to abide by an election outcome after a "fresh" showing of a thirty percent support. The Union argues that these facts necessarily lay the foundation for a bargaining order.

*Recognitional Strikes Not Necessarily Predicate for 8(a)(5) Bargaining Order*

■ As to recognitional strikes in support of a card majority, we do not think prior cases establish this a conclusive showing of "convincing evidence." Petitioners place primary reliance on United Mine Workers v. Arkansas Oak Flooring Co., 351 U.S. 62, 76 S.Ct. 559, 100 L.Ed. 941 (1956), but that case merely established that 'a state court could not enjoin a recognitional strike where there was a card majority, solely because the union had failed to take necessary steps toward securing a Board election. The issue as to whether a recognitional strike laid the foundation for an 8(a)(5) charge was not before the court.[42] While there are circuit court decisions indicating that a strike supported by a unit majority undermines a good faith claim of doubt as to majority status, these cases are distinguishable.[43] There is no case holding that the statute requires the Board to use recognitional strikes as conclusive evidence, and it is that position for which the union contends.

40. *See* 395 U.S. at 594, 89 S.Ct. 1918, quoted above.

41. JA at 53.

42. Petitioners point to the following passage in *Gissel,* 395 U.S. at 596–597, 89 S.Ct. at 1931', as establishing the Court's acceptance of recognitional strikes as necessarily showing convincing support:

Almost from the inception of the Act, then, it was recognized that a union did not have to be certified as a winner of a Board election to invoke a bargaining obligation; it could establish majority status by other means under the unfair labor practice provision of § 8(a)(5)—by showing convincing support, for instance, by a union-called strike or strike vote, or as here, by possession of cards signed by a majority of the employees authorizing the union to represent them for collective bargaining purposes.[11] [Footnote omitted.]

However, this passage merely begs the question here at issue, since the Court was simply using strike votes and cards as alterna-

tives. Not even the union contends here, nor has it ever been Board practice, that a card majority *per se* invokes a duty to bargain. This is given added emphasis by footnote 11 to the above cited passage from *Gissel* which reads:

The right of an employer lawfully to refuse to bargain if he had a good faith doubt as to the Union's majority status, even if in fact the Union did represent a majority, was recognized early in the Administration of the Act, see NLRB v. Remington Rand, Inc., 94 F.2d 862, 868 (C.A.2d Cir.), cert. denied, 304 U.S. 576 [58 S.Ct. 1046, 82 L.Ed. 1540] (1938).

43. *See, e. g.,* NLRB v. Harris-Woodson Co., 179 F.2d 720 (4th Cir. 1950 (recognitional strike, in context of refusal to negotiate with an already certified unit); NLRB v. National Seal Corp., 127 F.2d 776 (2d Cir. 1942) (recognitional strike accompanied by independent unfair labor practices, and anti-union animus of predecessor corporation.

Even assuming some test such as "independent knowledge" is required by the statute, that does not mean the Board must attach conclusive weight to recognitional strikes. As the Court described the role of the Labor Board in Republic Aviation Corp. v. NLRB, 324 U.S. 793, 800, 65 S.Ct. 982, 986, 89 L.Ed. 1372 (1945), "One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration." It is certainly permissible for the Board to avoid encouraging recognitional striking and picketing by refusing to regard them as an independent and conclusive method of demonstrating a majority, particularly since workers might well honor a picket line without necessarily supporting the union.[44]

*Other Evidence of Majority Support*

Aside from the fact that in *Linden Lumber* the employer refused to acknowledge the "fresh" showing of majority support—which we deal with below in a different context—the only other indication of majority support was the admission of the employer in *Wilder* to other officers of the Company, that the Union "had 10 or 11 of his employees." While the Second Supplemental Decision of the Board did not comment directly on this evidentiary point, relied upon in its First Supplemental Decision, disregard of this evidence was apparently related to the Board's rejection of "the wisdom of attempting to divine, in retrospect the state of employer (a) knowledge, depicting this as re-en-

try into the "good faith thicket." We assume the "10 or 11" statement was made by the employer, for the Board seemingly does not contest this prior Board finding. While it may be that there would be difficulties in determining the state of past employer knowledge, in this case and in others, we cannot accept the view that this requires a union petition for an election as the only means for obtaining recognition. We turn, at this juncture, to another predicate for issuing a bargaining order, related to "independent knowledge" and its "good faith" predecessor: the failure of the company to evidence its own "good faith doubt" by itself petitioning for an election.

B. *Failure of Employer to Petition for Election as Pertinent to "Good Faith"*

In *Gissel*, the Court reviewed the legislative history of § 9(c)(B) of the 1947 Taft-Hartley Amendments. The Supreme Court stated, 395 U.S. at 599, 89 S.Ct. at 1932:

> That provision was not added, as the employers assert, to give them an absolute right to an election at any time; rather, it was intended, as the legislative history indicates, to allow them, after being asked to bargain, to test out their doubts as to a union's majority in a secret election which they would then presumably not cause to be set aside by illegal antiunion activity [footnote 16 omitted].

In footnote 16, the Supreme Court noted that the Senate Report clearly indicates that the right to petition for an election was a way in which the employer could remove his doubt.[45] Neither Wilder nor

---

44. Refusal to cross a picket line may reflect mere fear, *see* NLRB v. Union Carbide Corp., 440 F.2d 54, 56 (4th Cir. 1971), cert. denied, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed. 2d 55 (1971). Or it may reflect a respect for what the individual supposes is the will of the majority even though he (and in fact a majority) does not wish the union to act as a bargaining representative.

45. As the Supreme Court noted, Senator Taft stated during the debates:

Today an employer is faced with this situation. A man comes into his office and says "I represent your employees. Sign this agreement, or we strike tomorrow" . . . . The employer has no way in which to determine whether this man really does represent his employees or does not. The bill gives him the right to go to the Board . . . and say, "I want an election. I want to know who is the bargaining agent for my employees."

Linden indicated that it wishes to have a doubt resolved by petitioning for an election. In the First Supplemental Decision in *Wilder*, two reasons were given for finding a violation of the duty to bargain. Besides holding that the employer had "independent knowledge" of the union's majority statute, the Board found that there was "insufficient evidence that the employer's refusal to grant recognition was based upon genuine willingness to resolve any doubts concerning majority status through the Board's election process," noting that "the Employer did not itself file an election petition or urge or even suggest to the employees or the Union the use of such procedures."

In *Linden*, of course the union did file a petition for an election simultaneous with its demand for recognition. The employer, however, after refusing to recognize on the basis of cards, indicated that he would not recognize the union even if it were victorious in an election. This led the Union to withdraw their petition and go straight to the 8(a)(5) proceeding, which was inevitable, in any event, at the end of the election process.

Of course, in *Linden*, the Board indicated that this fact would play no part in its decision since it was reassessing "the wisdom of attempting to divine, in retrospect, the state of employer (a) knowledge" and "(b) intent at the time he refuses to accede to a union demand for recognition." The Board went on to state ". . . if we are to let our decisions turn on an employer's 'willingness' to have majority status determined by an election, how are we to judge 'willingness' if the record is silent, as in *Wilder*, or doubtful, as here, as to just how 'willing' the Respondent is, in fact."

Whatever the merit of abandoning the "independent knowledge" doctrine because of the difficulty of reaching judg-

ments required as to state of mind, the same cannot be said as to "willingness to have majority status determined by an election." One simple act, a petition by the employer for an election,[46] could evidence such "willingness." Indeed it was the premise of the Taft-Hartley Amendment to § 9(c)(B) that employers could "test out their doubts as to a union's majority status" by petitioning for an election. In ignoring that opportunity, the Board ignores the very intent behind the statutory provision.

It is our view that the Board order cannot be enforced where both tests have been abandoned. It is conceivable that a restriction of "independent knowledge" to an agreement to abide by an authentication would be acceptable, if the employer was required to evidence his good faith doubt as to majority status, by petitioning for an election. The Board, on the other hand, is willing to resolve every assertion of doubt in the employer's favor, without permitting any "test" of those doubts. The union, of course, argues that an employer would violate § 8(a)(5) by petitioning for an election without entertaining actual doubt. This is, however, an issue we need not reach.

■ While we have indicated that cards alone, or recognitional strikes and ambiguous utterances of the employer, do not necessarily provide such "convincing evidence of majority support" so as to require a bargaining order, they certainly create a sufficient probability of majority support as to require an employer asserting a doubt of majority status to resolve the possibility through a petition for an election, if he is to avoid both any duty to bargain and any inquiry into the actuality of his doubt.[47]

■ When an employer petitions for or consents to election, the election proc-

---

46. Or an employer's voicing of a consent to abide by an election ordered on union petition.

47. The Board might, in order to reduce litigation and delay in these matters, adopt the rule that an employer must, when presented with an authorization card majority, either recognize the union or, within a reasonable time, petition for a certification election. Comment, *supra* 28, at 325. Without such a *per se* rule, of course, the Board would have to use some version of the "independent knowledge" test it considers workable,

ess is expedited.[48] If he declines to exercise this option, he must take the risk that his conduct as a whole, in the context of "convincing evidence of majority support," may be taken as a refusal to bargain.

As is only too often the case in litigation trenching on deep feelings, each of the parties focused on its extreme position—the unions, on their claim to an 8(a)(5) order based on an "independent knowledge" test retained in full flower; the Board and the companies, on their claim that an 8(a)(5) obligation can

in order to define those conditions where a failure of an employer to petition for an election would be a predicate for an 8(a)(5) bargaining order.

**48.** Board member Fanning, dissenting in the Second Supplemental Decision in *Wilder,* observed that:

[O]ur experience in conducting elections demonstrates that where employers are willing to go to an election, the election is held more expeditiously and with far less likelihood of interference in the conduct of the election than is the case where either party has to be forced to an election.

One commentator, on the basis of an interview with Martin Schneid, Assistant to the Regional Director, NLRB, has concluded that "an election contested through submission of objections at a pre-election hearing is likely to take sixty to sixty-three days between petition and balloting, while a consent election, in which the hearing is waived, is likely to take only twenty to twenty-three days. Comment, *supra* note 28, at 325 n.48.

The additional speed is obtained by the ability to dispense with objections at a pre-hearing conference. If an employer files a petition for an election, he would be required to define the appropriate unit and therefore would not be entitled, as an objecting party, to request a hearing. Nor could the employer object to a sufficient (30%) showing of majority support.

The direct consequences of such a rule are immediately apparent in the context of *Wilder* where the employer challenged the appropriateness of the unit—this was, in fact, an asserted reason for not recognizing the union on the basis of cards—and in *Linden Lumber* where the employer raised his possible § 8(a)(2) liability for recognizing a union dominated by supervisors, as well as connected unit problems. Yet the trial examiners in both cases found there was no basis for such concerns, thus indicating how such issues may be used to delay elections.

flower only in case of employer consent to authentication. And so the position set forth in this opinion was not advanced by the parties. It was presented by the court during the course of argument, and counsel had an opportunity to develop whatever objections were seen. If objections had subsequently been visualized, leave to file a post-argument memorandum could have been sought, and properly so. Hearing no such objection, and seeing none ourselves on further reflection [49], we conclude the principle herein set forth is sound.

**49.** We take note of the possibility that an employer may contend that he does not want to petition for an election because he fears that an agreement with the certified union may be challenged as a "sweetheart" deal prohibited by § 8(a)(2). Such a contention is more likely to reflect a tactic than a genuine problem. This seems to have been the case in *Linden,* where the employer first objected to the Union petition for election on the ground of inclusion of supervisors in the unit, then promised to proceed with a consent election if the Union made a fresh start, yet later objected to a new Union showing of interest on a petition for election established without cards from the challenged persons, on the ground that the problem was not remediable.

In any event, to the extent that an employer's petition for election may be followed by an issue under § 8(a)(2), on a "sweetheart" objection, this is a modest and limited difficulty which was accepted by Congress as an objection lacking sufficient significance to override the value of employer petitions in arriving at labor peace and resolution of problems.

Of course, the possibility exists—indeed it was raised in *Linden Lumber*—that the employer would be subject to an 8(a)(5) violation if he did not recognize a union, but subject to an 8(a)(2) charge if he did, and it was later found that the Union was employer-dominated. This possibility is significantly increased, it could be argued, by taking away the possibility of raising the 8(a)(2) defense to a union election petition, as a self-protection measure of the employer. *See* International Ladies' Garment Workers Union v. NLRB, 366 U.S. 731, 81 S.Ct. 1603, 6 L.Ed.2d 762 (1961). One possible reply to this dilemma is that it is less of a problem following an election, as compared to the situation which would exist if the only option was card recognition. *See id.* at 739, 81 S.Ct. 1603; *Compare* Shea Chemical Corp., 121 NLRB 1027 (1958).

## IV. CONCLUSION

We hold that if "independent knowledge" is to be restricted, some alternative must be put in its place to prevent an employer's deliberate flouting and disregard of union cards without rhyme or reason. The complete lack of such an alternative would not be consistent with the Act. If no "independent knowledge" or "good faith" test is to be used by the Board, the employer must be put to some other kind of test to evidence good faith. *Compare* Food Store Employees Union v. NLRB, 155 U.S.App.D.C. 101, 476 F.2d 546, 554 (1973). The alternative such as employer petition for election retains primary emphasis on the election process, and its preferred status. The position adopted by the Board is inconsistent with the Act and its orders must be reversed. We remand to the Board to reconsider what option, consistent with the statute, it wishes to follow.

Reversed and remanded.